## CONTINENTAL CASUALTY COMPANY *v.* LLOYD.

[No. 20,351.   Filed March 16, 1905.   Rehearing denied June 1, 1905.]

1.  TRIAL.—*Stipulations.*—*Validity.*—Stipulations by parties or their attorneys, in the trial of a cause, will be enforced by the courts, unless they are unreasonable, contrary to good morals, or contrary to public policy.   p. 55.

2.  SAME.—*Stipulations.*—*Limiting Question for Jury.*—A stipulation, in an action on an accident policy, that the only question to be litigated is that of the cause of decedent's death, is not objectionable, and such stipulation is a waiver of any other defense.   p. 55.

3. PLEADING.—*Complaint.—Stipulations.—Effect.*—A stipulation, in an action on an accident policy, that the only question to be litigated shall be the cause of decedent's death, waives any objection to the complaint based upon facts impliedly admitted by such stipulation.   p. 55.

4. INSURANCE.—*Accident.*—*Proximate Cause.*—An accident policy, limiting the company's liability to "bodily injuries effected through external, violent and purely accidental causes—such injuries as shall, solely and independently of all other causes, necessarily result in death," relates to proximate and not to remote causes.   p. 59.

5. TRIAL.—*Jury.—Question for.*—In an action on an accident policy, where two or more causes contribute to the injury, or the facts are such that equally prudent persons can draw different conclusions, the question, which of the causes is the efficient, dominating, proximate cause of such injury, is for the jury.   p. 60.

6. INSURANCE.—*Accident.—Proximate Cause.—New Trial.—Evidence.*—Where the evidence showed that assured, in excellent health and with no symptoms of disease, while walking along the sidewalk, struck his toe against a protruding water box, causing a violent fall; that the symptoms of cerebral hemorrhage immediately developed and continued until assured's death nineteen days later; that the post-mortem revealed that a tumor existed surrounding about two inches of the right middle cerebral artery, and there was expert evidence that the death was the result of an arterial blood clot where such tumor was located, cutting off the blood supply, the jury was warranted in finding that the fall was the immediate, dominant and proximate cause of assured's death.   p. 60.

7. SAME.—*Accident.—Disease.—Proximate Cause.*—Though an accidental fall would not have proved fatal to assured, except for the weakening of a cerebral artery by a tumor surrounding a portion of the same, still such fall may be the proximate cause of such death.   p. 62.

8. NEW TRIAL.—*Evidence.—Failure to Move to Strike Out.—Appeal and Error.*—Where evidence is voluntarily given by a witness, without invitation by the appellee or the court, and appellant fails to move to strike it out or withdraw it from the consideration of the jury, no question can be raised thereon on a motion for a new trial or on appeal.   p. 64.

9. SAME.—*Evidence.—Admission of.—Exception.*—Where defendant moved to strike out an improper answer by a witness for plaintiff, but in the motion for a new trial assigned as a reason therefor that the court erred in admitting such answer in evidence, no question is presented.   p. 66.

From Laporte Superior Court; *Harry B. Tuthill,* Judge.

Action by Eliza Lloyd against the Continental Casualty Company. From a judgment for plaintiff, defendant appeals. Transferred from the Appellate Court under §1337u Burns 1901, Acts 1901, p. 590. *Affirmed.*

*Arthur W. Underwood* and *L. L. Bomberger,* for appellant.

*Peter Crumpacker* and *Daniel J. Moran,* for appellee.

HADLEY, C. J.—This action was instituted by Eliza Lloyd, appellee, beneficiary under an accident insurance policy issued to her husband, William M. Lloyd, by appellant on September 11, 1901, to continue in force one year from date. William M. Lloyd's death occurred on October 22, 1901. The action is based upon the policy, and proceeds upon the theory that the decedent sustained a fall while traveling on a sidewalk on October 3, 1901, causing his death.

Under issues formed by the general denial, there was a trial, verdict and judgment for plaintiff for the full amount of the policy.

Before the trial was entered upon, the parties entered into the following stipulation: "In consideration that the plaintiff withdraws her motion filed in this cause for the inspection of certain books, papers, records, reports, correspondence, etc., therein named, and waives her right, if she have any, to inspection and copy of all reports of physicians, agents and representatives of defendant, regarding the state of health, cause of death and report of autopsy *re* death of William M. Lloyd, it is hereby stipulated and agreed that the only question to be litigated in said cause shall be and is as to the cause of the death of the plaintiff's decedent, William M. Lloyd, and it is further agreed that if the court hereafter order inspection by plaintiff of any of the records, the inspection of which is now hereby waived, said inspec-

tion shall be had at the office of the defendant, in the city of Chicago, Illinois.    Dated this 12th day of June, 1902."

Stipulations by parties or their attorneys, entered into for the government of their conduct, or control of their rights, in the trial of a cause, are generally enforced by the courts, unless they appear to be unreasonable, or in contravention of good morals or of sound public policy.    *Hine* v. *New York, etc., Co.* (1896), 149 N. Y. 154, 160, 43 N. E. 414; *Clason* v. *Shepherd* (1859), 10 Wis. 356; *McCormack* v. *Phillip* (1887), 4 Dak. 506, 532, 34 N. W. 39; 20 Ency. Pl. and Pr., 607, and authorities there collated.

Nothing unfair or obnoxious appears from the above agreement, and it will therefore be treated, as its terms import, as a waiver by the defendant of all matters of defense to the plaintiff's claim save and except only the cause of the death of plaintiff's decedent, William M. Llyod; otherwise and interrogatively expressed, the issue is narrowed to, did Lloyd's death occur solely by accident within the conditions of the policy in suit?

The stipulation makes unimportant certain questions raised by demurrer to the sufficiency of the complaint, since the defendant cannot be harmed by the plaintiff's failure to allege matters waived, or impliedly admitted by the agreement.    *Eliason* v. *Bronnenberg* (1897), 147 Ind. 248, 255; §348 Burns 1901, §345 R. S. 1881.

There can be no question that the cause of death of the insured is sufficiently alleged in the complaint, and the stipulation will, therefore, eliminate from our consideration all questions presented by the record except those arising under the motion for a new trial.    Chief among the reasons assigned in the motion are the insufficiency of the evidence to sustain the verdict, and that the same is contrary to law.    The insistence of appellant is that there is a total absence of evidence to show that Lloyd's death resulted

from purely accidental causes, and, as to that material fact, the verdict is without support.   In entering upon the consideration of this question we assume that the burden is upon appellee to establish that the manner of the insured's death was within the terms of the policy.   *Sharpe* v. *Commercial Travelers, etc., Assn.* (1894), 139 Ind. 92.

We are not called upon to consider the weight of the evidence and decide whether the preponderance is with the appellee, if there was evidence on both sides, but, the burden being on the appellee, it must appear that there was at least some evidence, direct or inferential, in support of the contested proposition.   If, however, we find any legal evidence in support of all the essential facts in the matter controverted, we must assume that such evidence was sufficient to satisfy the jury as against all the adverse evidence, and leave the facts so found undisturbed.

Appellee's theory of the case, which was evidently adopted by the jury, seems to be that the insured, who was a boss roller in a rolling-mill, being in good health, having eaten his supper, left his boarding-house in the twilight of the evening on October 3, 1901, to go to the post-office, about two and one-half blocks away; that when he had covered about one-half of the distance he struck his toe against a water box that protruded two inches above the sidewalk, whereby he was thrown violently to the ground, the shock caused by the fall producing cerebral hemorrhage, which caused his death on the 22d day of the same month.

It is not debatable that there was sufficient evidence to warrant the jury in finding that Lloyd stubbed his toe on a water box and fell violently onto the board sidewalk, or into the macadamized gutter.   The question now is, was there evidence produced at the trial to the effect that the fall so received was the only active, efficient and proximate cause of the death of the insured?   The cause of death was a question of fact for the jury, and our task is done if we find there was some legitimate evidence in support of their

conclusion.   There, was evidence to the following effect:
Before his last illness Lloyd was a man who for years had
appeared to be in excellent health, with no symptoms of
nervous disorder, no headache, no nausea, no vertigo, no
drowsiness, and there were no manifestations that the brain
was in any other than a normal condition.   He was over
fifty years of age, five feet ten inches in height, weighed
from 165-to 175 pounds, made no complaints of physical
ailments, and was constantly engaged in his employment.
In the dusk of the evening of October 3, 1901, on his way to
the post-office, he was seen in a "getting-up position" at a
point in or near the sidewalk where a water box extended
two inches above the surface of the walk.   In a few min-
utes thereafter it was observed that his hands were lacer-
ated and bleeding, as if cut by the broken stone or macadam,
his hat and the front of his clothing were "covered with
dust," and he had a mark upon his shoe which indicated
that it had been in severe contact with some hard substance.
In a few minutes after the fall he complained of pain in
his head, compressed his head with his hands, and was
accompanied to his boarding-house by the superintendent of
the rolling-mill.   The next morning he went to the rolling-
mill to resume his duties as boss roller.   During the day
he was sleepy, dull, and complained of headache, and spent
much of his time lying on a bench.   In the evening, about
5 o'clock, he was assisted home and to his room by the
superintendent,   and   appellant's   local   physician,   Dr.
Schleiker, was summoned to attend him.   He was found by
the physician to be complaining of a severe headache, slight
chills and general lassitude.   The next morning the doctor
found him in a stupor, verging on coma; he was not easily
aroused, his responses incoherent, and he still complained
of pain in the head.   In the evening of the same day all
the symptoms had become more profound.   His stupor had
increased; it was more difficult to arouse him, and apparent-
ly he knew nothing.   The next day the' stupor had increased

to coma.   At this time his breathing was stertorous, both slow and deep, and shallow and rapid.   This condition continued about a week, when he regained consciousness and appeared to be improving, although at times incoherent in speech.   In about a week his drowsiness returned, although he did not complain further of headache, and gradually sank into coma, from which he never recovered.   There was an inequality of the pupils, which showed undoubted pressure on the brain; also sensory paralysis and increased reflexes; also slight paralysis of facial muscles was indicated by the blowing, breathing and stertorous respiration. The skull was trepanned, the membranes of the brain laid bare, opened, and a dram and a half of serous, blood-tinged fluid escaped through the opening.   Dr. Schleiker and a consulting physician diagnosed the case as cerebral hemorrhage produced by the fall, and, as stated by the former: "I had been told by his immediate friends that he had had a severe fall, and the fact that these symptoms all came right on the heels of the fall made it apparent that it was due to that; in fact, he was in perfect health previous to that."   The hemorrhage could be due to the shock of the fall.

An autopsy, witnessed by Dr. Schleiker, was held on the body, which revealed the existence of a tumor surrounding the right middle cerebral artery, obscuring about two inches of the artery.   This artery is the only source of blood supply to a portion of the brain.   A tumor of this size and form requires from six months to two years to form.   The encroachment of the tumor upon the caliber of the artery tended to inflammation, and ultimately to blood clot, which would cut off from a part of the brain the blood supply, by obstructing the artery.   There was further testimony that in tumor of the brain there are usually premonitory symptoms, and in hemorrhage of the brain practically none. The characteristic difference between tumor and hemorrhage being that in cerebral hemorrhage the onset is rapid, and in

tumor gradual, the premonitory symptoms of the latter be-
ing headache, nausea, vertigo and drowsiness; and it was
the opinion of Dr. Schleiker, after he had performed the
operation of trepanning and witnessed the autopsy, that
the immediate cause of death was hemorrhage, and not
tumor, and, among others, ascribed as a reason that there
could not, in his opinion, be a gradual closing of the artery
by tumorous growth, entirely unaccompanied by symptoms,
and the individual be able to walk and do business up to
the instant of complete closure.   Dr. Schleiker, while giv-
ing evidence for the plaintiff, testified that "the tumor
found on autopsy [which possibly, as he afterwards ex-
plained] had weakened the wall of the artery, and the
shock of the fall ruptured the artery, so that the fall was the
immediate cause of the illness· which resulted in Lloyd's
death."   He also stated that "the immediate cause [of
death] was undoubtedly the hemorrhage superinduced by
the condition of the brain and the shock of the fall."

The defendant produced evidence contradictory of the
hemorrhage theory, and which tended to show that there
was neither hemorrhage nor arterial rupture, and that both
the fall and the death of Lloyd were caused by the forma-
tion of a blood clot within the walls of the diseased artery,
which at the point of the tumor plugged the channel and
cut off the supply of blood to a portion of the brain.   Not-
withstanding this view was rejected by the jury, appellant
contends that the plaintiff failed to make out her case with-
in the terms of the insurance contract, because she has
shown by her own witness, Dr. Schleiker, that the insured's
·death ensued partly from accident and partly from the
diseased and weakened condition of the artery.

The liability of appellant is limited to "bodily injuries
effected through external, violent and purely accidental
causes—such injuries as shall, solely and independ-
ently of all other causes, necessarily result in death
within ninety days."   The causes referred to in this

class of instruments relate to proximate, and not remote, causes. *National Benefit Assn.* v. *Grauman* (1886), 107 Ind. 288, 290; *Fetter* v. *Fidelity, etc., Co.* (1903), 174 Mo. 256, 73 S. W. 592, 61 L. R. A. 459, 97 Am. St. 560.

When two or more causes contribute to an injury, where there is doubt, or the facts of a character that equally prudent persons would draw different conclusions

5.   therefrom, in such cases, which of the contributing causes is the efficient, dominant, proximate cause, is a question to be submitted to the jury. *Terre Haute, etc., R. Co.* v. *Buck* (1884), 96 Ind. 346, 351, 49 Am. Rep. 168; *Modern Woodmen, etc., Assn.* v. *Shryock* (1898), 54 Neb. 250, 74 N. W. 607, 39 L. R. A. 826; *Travelers Ins. Co.* v. *Melick* (1894), 65 Fed. 178, 12 C. C. A. 544, 27 L. R. A. 629; *Martin* v. *Equitable, etc., Assn.* (1891), 61 Hun 467, 16 N. Y. Supp. 279.

Here it is shown, without dispute, that there was a tumor upon Lloyd's brain. But it does not necessarily follow that it was a proximate cause of his death. Dr.

6.   Ohlmacher, a pathologist of learning and experience, and who conducted the autopsy for appellant, and appeared as a witness in its behalf, testified that the autopsy disclosed that a blood clot, or thrombus, had formed within the walls, and effectually plugged the artery at the point where the channel was narrowed by the tumor. He further testified, in effect, that at the point of obstruction the tumor had contracted the caliber of the artery to about one-half its normal size, which, however, in capacity, in the absence of thrombus, would be sufficient to nourish the brain and prolong life indefinitely, and perhaps for years without marked inconvenience to the individual; that blood outside its natural sphere, or when it comes in contact with any other matter other than the peculiar substance of which the inner coating of the blood vessels is composed, speedily coagulates, or forms an organized clot; that when death came to Lloyd the tumor had penetrated and weakened the

walls of the vessel, and a rupture of the inner coating at the point of stricture, thereby bringing the blood in contact with the matter of the outer wall, would conduce to thrombus, which, in fact, is the usual way in which clots from injury are formed. The substance of this testimony of Dr. Ohlmacher is that at death, excluding the blood clot, the tumor on Lloyd's brain had not reached a fatal stage, and probably would not have produced death for years to come, and, furthermore, that the fatal clot might have been caused by a rupture of the inner coating of the artery by a sudden influx of blood into the narrowed duct from a violent exertion of the heart.

This evidence, when considered together with the testimony of Dr. Schleiker, the insured's age, his weight, the unexpectedness and severity of his fall, the speedy development thereafter of symptoms of brain pressure, the total absence of all premonitory symptoms of tumor or brain disorder prior to the fall, leaves no room for argument but that the jury had before it legal evidence, both direct and indirect, in support of its conclusion that Lloyd's death was caused by accident, independently of all other causes. And it makes no difference whether it found that the cause closest the death was hemorrhage of the brain, or an organized blood clot within the walls of the cerebral artery. It had the right to find that the accidental fall was the cause that put his life in jeopardy, because it incited the fatal energy of the tumor, which was at least dormant, and would have remained so for an indefinite period, and, perhaps, until death from some other cause would have supervened. The tumor had impaired the resisting strength of the artery, but had not effected immediate danger to life. It was proper under the evidence for the jury to view the impairment as a condition, and not as a cause, and to find that the fall was the originating, efficient, direct and proximate cause of death; that is, that the fall set in motion a force that progressed upon present existing conditions in natural,

usual sequence to effect the fatal result.   Twelve bricks are set in a row, eight inches apart.   By accident the first is toppled and falls against number two, which in turn falls against and throws number three, and so on until number twelve is cast down by number eleven, and inflicts injury. With a proper footing number twelve might, or might not, have fallen.   In such case could it be said that because brick number twelve had a weak and imperfect footing such imperfection was the direct, dominant, proximate cause of the injury ?   Who knows that the artery would not have been ruptured by the fall if it had been in a normal condition ?   Or who can tell that the insured would not have died from some other cause if the fall had not animated and accelerated the energy of the tumor.   In fact, Dr. Ohlmacher testified that the autopsy disclosed in the vital organs of the deceased, in addition to the tumor, "some affection of the mitral valve of the heart, some consequent enlargement of the heart, a beginning broncho-pneumonia, a beginning acute Bright's disease, and a moderate fatty change in the liver."

From these considerations it seems clear that the jury, in its search for the proximate cause of death, had the right to conclude that even though the fall would not have produced death but for the impaired artery, the tumor at most was a remote, and not a proximate, efficient cause.   Fetter v. Fidelity, etc., Co. (1903), 174 Mo. 256, 73 S. W. 592, 61 L. R. A. 459, 97 Am. St. 560, and Freeman v. Mercantile, etc., Assn. (1892), 156 Mass. 351, 30 N. E. 1013, 17 L. R. A. 753, are recent and very similiar cases.

In the Missouri case, supra, the conditions of the accident policy were almost identical with the one under consideration.   The insured, who was and had been for years apparently in good health, preparatory to leaving his office, took up a window pole for the purpose of closing a window, the upper sash of which had been let down.   The sash was

bound. Placing the pole against the upper rim of the sash, the insured vigorously exerted himself to force the sash up to its place, when the pole slipped off the sash, thereby causing the insured to fall and strike his right side violently against a nearby table. He immediately turned pale and groaned, went home, took a light repast, and went to bed. During the night he passed blood in his urine. He suffered pain in the right kidney, called a physician, and continued to pass blood in the urine. Seven days after the injury an exploratory operation in the region of the kidney was performed, which disclosed a ruptured, enlarged and bleeding, but otherwise normal, kidney. It was found impossible to stop the hemorrhage, and the patient died from loss of blood twenty-seven days after his fall. An autopsy revealed that the lower end of the kidney was cancerous, harder than the normal part, and the rupture was found to be between the normal and cancerous parts. The hemorrhages were from the rupture, and the hemorrhages caused death.

In answering the contention that the rupture was due to weakness effected by the cancer, and that death did not result from the fall "independently of all other causes," and in holding that the cancerous condition of the kidney was a remote, and not a proximate, cause, the court said: "The causes referred to in the policy are the proximate or direct, not the remote causes. This was evidently the view of the trial court when it modified the second instruction asked by defendant, inserting the word 'direct' before the word 'cause,' thereby directing the jury that they could not find for the plaintiff unless they found that 'the accident was the sole and only direct cause of the death of the insured,' and that view of the law was correct."

In the Massachusetts case, *supra,* the provisions of the policy are substantially the same as in the present case. The insured died of peritonitis, induced by a fall. It was shown that the deceased had previously had peritonitis in

the same region, and that the former attack had produced effects which rendered him very liable to its recurrence. The principal question in the case is thus stated by the court: "What kind of cause is to be deemed proximate within the meaning of the policy?" In answering the question, the court said, among other things: "The law will not go farther back in the line of causation than to find the active, efficient, procuring cause, of which the event under consideration is a natural and probable consquence, in view of the existing circumstances and conditions. The law does not consider the cause of causes beyond seeking the efficient predominant cause, which, following it no farther than those consequences that might have been anticipated as not unlikely to result from it, has produced the effect. An injury which might naturally produce death in a person of a certain temperament or state of health is the cause of his death, if he dies by reason of it, even if he would not have died if his temperament or previous health had been different; and this is so, as well when death comes through the medium of a disease directly induced by the injury, as when the injury immediately interrupts the vital processes." For further instructive cases, see *Hall* v. *American, etc., Assn.* (1893), 86 Wis. 518, 57 N. W. 366; *Peck* v. *Equitable, etc., Assn.* (1889), 52 Hun 255, 5 N. Y. Supp. 215; *Martin* v. *Equitable, etc., Assn., supra.* We conclude that there is in support of the verdict evidence sufficient to forbid our disturbing it, and to characterize it as not contrary to law.

In the course of his direct testimony for the plaintiff, N. Emmerling, who was the undertaker in charge and had prepared for burial the body of the deceased, stated that, upon his return to the house further to administer to the body, he found that a post-mortem examination had been made. "Did you meet the persons there that performed the post-mortem? A. I met doctors just going out of the house. Did you know them? A. No,

sir. Did you have any conversation with them? A. Only a word or two as they were leaving the house. How many did you notice? A. Four or five. Was the person who addressed you one of the physicians that held the post-mortem, if you know? A. Yes, sir. He did not say so, but he made a remark that made me think he was one of them. What was that remark? [To which question the defendant interposed an objection. Objection overruled and exception.] A. He asked me if I was the undertaker in charge of the body. I told him, 'Yes,' and he replied: 'We held a post-mortem on the body, and found it well embalmed and in good condition.' [By the court.] Said what? A. Said the body was well embalmed. [By the court.] That made you feel good? A. Yes. So I asked him if he left the body in good shape after the post-mortem, and he said, 'Yes.' I then said: 'Did you find out anything more by the post-mortem than you had before?' and he replied: 'Keep quiet,' and walked on."

It is contended by appellant that since it is not shown that the doctor who exchanged remarks with the witness was the authorized representative of appellant, his remark, "Keep quiet," was irrelevant and improper, and, on account of the peculiar delicacy of the subject to which it related, was greatly prejudicial. However improper and prejudicial, appellant seems to be without relief, for it has brought no question here for our decision. There was no motion made to strike it out. The remark was not invited by the question, and was in no sense responsive to it. The question propounded to the witness was, "What was that remark?"—that is, the remark that caused the witness to believe that the doctor who addressed him participated in the post-mortem. Considered in connection with the inquiries that preceded, the question is plainly limited to the single fact. That the question was so understood by the witness is manifested by his pertinent and complete answer

in these words:   "He asked me if I was the undertaker in charge of the body.   I told him 'Yes,' and he replied: 'We held a post-mortem on the body, and found it well embalmed and in good condition.' "   The court, failing to hear the answer, addressed the witness with "Said what?" and the witness repeated "Said the body was well embalmed."   It is evident that at this point the witness had concluded his answer.   It was full and complete.   No further question was asked concerning the matter, and here the incident, no doubt, would have closed, had not the court in a friendly and congratulatory spirit called the subject up again by the words "That made you feel good?"   Upon the suggestion of the court the witness proceeded to make use of the offensive language.   The statement was purely voluntary, without being invited by appellee or the court, and, if prejudicial or objectionable to appellant, it should have moved that the court expunge it from the record and withdraw it from the consideration of the jury.   Having failed to do this, no question is presented.

Thomas Whitehouse, a witness for the plaintiff, had stated that on the evening of the insured's alleged fall, while on his way to the post-office between 6 and 7 o'clock he saw the insured in the position of "getting up," and that in a few minutes afterward, when coming out of the post-office he met Lloyd near the door, in conversation with a Mr. Williams.   "Well, what did you notice concerning Mr. Lloyd?   A. He was conversing with Reese Williams, and turned to me and said [Here he was admonished by both the court and plaintiff's attorney to state what he saw and not what Lloyd said, but the witness, continuing his answer, added]:   "That his conversation with Mr. Reese Williams was on the way he had fallen and hurt himself."   The court overruled appellant's motion to strike out the latter branch of the answer, to which ruling appellant excepted.   In assigning the ruling as a reason for a new trial, it is stated thus:   "The court

erred in allowing Thomas Whitehouse, called by the plaintiff, to testify that, in a conversation between the witness and William Lloyd, Lloyd told the witness that, on the way he (Lloyd) had fallen and hurt himself." The exception reserved presents no question, for at least three reasons: (1) Because, in the assignment as a reason for a new trial there is a failure to state the question in such terms as will clearly indicate to the trial court the identity of the particular subject and ruling complained of *(Dunn* v. *State* [1904], 162 Ind. 174, and cases cited); (2) because the record nowhere discloses that the court allowed the witness Whitehouse to testify to a conversation between the witness and Lloyd, in which the latter told witness that on the way he had fallen and hurt himself; and (3) because the exception reserved was to the overruling of a motion to strike out, and not to the admission of testimony over objection.

Divers other adverse rulings relating to the admission and exclusion of evidence, and the refusal of the court to sign the instructions given to the jury, that were assigned as reasons for a new trial, are suggested by appellant as constituting reversible error. Notwithstanding none of them are presented in compliance with subdivision five of rule twenty-two of this court (see *Buehner Chair Co.* v. *Feulner* [1905], 164 Ind. 368), we have nevertheless given consideration to each, and find no error.

Judgment affirmed.