RICHARD JORDAN, Appellee, v. IOWA MUTUAL TORNADO INSURANCE COMPANY OF DES MOINES, Appellant.

Tornado insurance: LIVE STOCK INDEMNITY: EVIDENCE. In this
1 action upon a policy of insurance indemnifying against loss of live stock by tornado, cyclone or wind storm, the term wind storm means more than an ordinary gust of wind no matter how prolonged; and it is held that the evidence shows a storm as defined by the policy.

Same: CONSTRUCTION OF POLICY. The indemnity afforded by a policy
2 of insurance against loss of live stock by wind storm, cyclone or tornado, is not limited to damage due directly to the physical injury caused by driving the stock against some obstacle, or of the hurling of some object against the stock; but should be given a more liberal construction; and if the policy is so worded as to require interpretation and is fairly susceptible of different constructions, that construction will be adopted which is most favorable to the insured.

Same: CAUSE OF LOSS. Where the evidence justified a finding that

a wind storm was the efficient cause of injury to live stock covered by a policy of insurance against loss by wind storm, cyclone or tornado, the fact that other causes may also have contributed to the loss will not of itself relieve the insurer from liability.

**Same:** EXCEPTIONS: BURDEN OF PROOF. Where a policy of insurance indemnifies against loss by wind storm, cyclone or tornado, but excepts loss from other causes, the burden is upon the insurance company to show that the loss was within the exception.

**Same:** AMENDMENT OF BY-LAWS: CHANGE OF CONTRACT. Where the agreement of a policy holder is that he will be governed by the articles of incorporation and rules in force when the policy was issued, or which might thereafter be made by the association, the association can not by amendment of its by-laws introduce new terms and conditions into the original contract, which will bind the insured, unless he assents thereto.

In the instant case an amendment of a by-law made after the issuance of the policy exempting the company from liability for loss occasioned by the blowing of snow and hail was not binding upon the insured.

*Appeal from Mitchell District Court.*—Hon. C. H. KELLY, Judge.

SATURDAY, MARCH 11, 1911.

ACTION at law upon two policies of insurance covering damages due to tornadoes, cyclones, and windstorms. Trial to the court without a jury, judgment for plaintiff, and defendant appeals. *Affirmed.*

*Dunshee & Haines* and *Geo. E. Marsh,* for appellant.

*Eaton & Salisbury,* for appellee.

DEEMER, J.—Defendant issued two policies of insurance upon live stock promising indemnity against loss or damage by tornadoes, cyclones, or windstorms; one policy was issued to plaintiff and the other to Matt Fox, and they are alike in terms and conditions. After the loss upon

which this action is in part bottomed, Fox assigned his claim to plaintiff and the action is upon both policies. Each policy contained this provision: "I further agree to be governed by the articles of incorporation and rules, now in force or hereafter made by said association, and to pay all assessments made on me by the association in accordance with its rules." And on the back of each was the following by-law: "Nor shall it be liable for damage to live stock by the blowing or toppling over of hay or straw stacks, or by snow or hail." After the issuance of the policies defendant amended this by-law so as to make it read as follows: "Nor shall it be liable for damages to live stock . . . by blowing of snow or hail."

Plaintiff claims that both he and Fox suffered a loss on live stock by reason of a tornado or windstorm occurring on January 29, 30, and 31 of the year 1909, and that the total damage amounted to $817, for which amount he asked judgment. Defendant denied that the loss was due to a tornado, pleaded that the loss, if any, was wholly outside of the terms of the contract and that the cattle died of causes not insured against by defendant. A jury was waived and the cause was tried to the court upon the issues thus presented. The trial court made a finding of facts from which we extract the following:

The policy is an ordinary tornado, windstorm, cyclone, Iowa policy, and purports to protect the assured against loss occasioned by windstorms, tornadoes, and cyclones. Now, the definition of a windstorm is very broad, and, as counsel has suggested, sometimes includes all of the others. There is an exception contained in the by-laws to the effect, as I recall it, that the policy does not cover loss by snow or hail, and by an amendment it is made to say by the blowing of snow or hail. Now, the storm which occasioned the loss in this case was a severe one, and it seems to me clearly comes within the definition of a windstorm, and I think that the primary cause of the loss was the windstorm and I find such to be the fact as

shown by the evidence. It seems to me that it would be incumbent upon the defendant to show this exception exempted the company from loss and they have not done that. At most, all that we can say in reference to the matter of the snow is that if it had not been for the blowing of snow, perhaps the loss would not have occurred and these cattle might not have perished. I am sure I do not know what the fact is in reference to that. It seems to me that, as I say, it was incumbent upon the defendant to show that the exception applied. They have failed to do it. I think the burden of proof was upon the defendant to show that. If a tornado policy or a windstorm policy did not afford protection from this sort of storm—a windstorm in winter, it seems to me that you might just about as well put a clause in the policy saying that it should not be operative during the winter months. It is very difficult for me to conceive of a wind in this locality in winter which is likely to occur when there would not be more or less snow in the air, blowing snow, and if this clause, in the absence of any evidence except the fact that there was drifting and blowing snow, was to constitute an absolute defense to the company and excuse them from liability, then you might as well make a clean cut of it and say that the policy should not be operative during the winter months. I presume that it is possible that there might be a windstorm or tornado in the winter without very much blowing snow, but in practical operation it does not exist in this locality. Now, I have treated this question as though this amendment to the by-laws was operative, and I do not consider it necessary for me to absolutely pass on that question, but for the purposes of this determination I have treated it as though it was in fact in full force and effect as to this policy issued before the by-laws were claimed to have been adopted. I rather incline to the view that this by-law would be effective, and hence consider it in that way, but I do not find especially on that point.

Based thereon a judgment was rendered for plaintiff for the amount claimed. The appeal is from these findings and the judgment so rendered.

Eliminating for the present the amendment to the by-

law it is apparent that defendant promised indemnity against loss or damage on live stock by tornado, cyclone,

1. TORNADO
INSURANCE:
live stock
indemnity:
evidence.

or windstorm, but specifically provided that it should not be liable for damage by snow or hail. It is not claimed that the injury to the cattle was the result of a cyclone, but it is insisted that they were injured and perished as a result of a tornado or a windstorm, and not by snow or hail. The term "tornado" has a well understood meaning. It has been defined as follows: "The words 'tornado' and 'hurricane' are synonymous, and mean a violent storm, distinguished by the vehemence of the wind and its sudden changes. A hurricane is a very high wind, so that an allegation in an answer denying that the loss was caused by a tornado or hurricane, but stating that it was caused by a very high wind, admits that it was caused by a tornado or hurricane." *Queen Ins. Co. v. Hudnut Co.,* 8 Ind. App. 22 (35 N. E. 397). And in *Spensley v. Ins. Co.,* 54 Wis. 433 (11 N. W. 894), the court said: "A 'tornado' is defined by Webster as a violent gust of wind, or a tempest distinguished by a whirling, progressive motion, usually accompanied by thunder, lighting, and torrents of rain, and commonly of short duration and small breadth; a hurricane. Other dictionaries give substantially the same definition, and that it is generally accompanied by thunder and lightning and rain or hail, and appears to have an electric origin, so that whether a loss was caused by a tornado or the lightning accompanying it is a matter for the jury."

The word "windstorm" is a simple one and is defined by Webster to be: "A storm characterized by high wind with little or no precipitation." As used in the policies in suit it should be construed as something more than an ordinary gust of wind, no matter how prolonged; and it takes its meaning measurably at least from the other words with which it is associated, to wit, tornado and

cyclone. However, it need not have either the cyclonic or the twirling or whirling features which usually accompany tornadoes or cyclones, but it must be more than an ordinary current of air no matter how long continued. In other words, it must assume the aspect of a storm, i. e., an outburst of tumultuous force. Now, the trial court was justified in finding that the storm which caused the damage to the live stock or which directly and approximately contributed thereto was one of the worst of what are known familiarly in the Mississippi valley as "blizzards." This term has found its way into the dictionary and it is defined by Webster to be: "A violent blow. A dry, intensely cold, violent storm, with high wind and fine driving snow, such as those which originate on the Eastern slope of the Canadian Rocky Mountains."

We here quote some of the testimony with reference to the character of the storm:

During the night of the 28th a storm came up. When we got up on the morning of the 29th the wind was the highest wind I ever felt or knew of. It was blowing straight from the north. The snow was blowing. The snow was in the air. I couldn't see the windmill. It was twenty feet from the kitchen, I should judge. The reason I could not see it was too dark with the wind and the storm. I got up somewhere about 7 o'clock, and up to 8 o'clock I could not see the windmill half the time from the kitchen window. The weather was not awful cold, but it was the highest wind that I ever experienced. I attempted to face the wind. I opened the door and went outside the door and then I came back. I didn't think I could go out. . . . There was no time during this storm when I could see as far as across the road. The wind tore down a new steel windmill which I had just put up in the summer. It was all twisted and broken to pieces. Before it was blown down it was in good condition. It was properly erected and constructed. It was stout and strong and a high-grade windmill. The same storm blew down a windmill on Johnathan Hall's place about two miles east and about a mile south of my place

and also some pine trees.  .  .  .  The worst of the storm
was about 8 o'clock in the morning.   The storm lasted all
day and into the night, but I thought the worst of it was
along about 8 o'clock in the morning, or about 8 I thought
that was the worst.   The storm lasted all day, as I said,
but I think the wind was one-fourth lower after 8 o'clock
in the morning.   After the windmill went down, I think
it was somewhere about 8 o'clock, I got right over to the
cattle.   I found that there were about twenty of the cattle
missing.   We had difficulty in getting over to the cattle.
We couldn't stand it to go to them with the wind, we
couldn't face it, we would turn around.   I didn't go any
farther at this time than where the cattle were.   I knew
quite a number of the cattle were missing, but I couldn't
count them very well on account of the storm.   It was
not very cold.   Where the cattle were it was all melted.
They were, of course, on the south side of the storm by
the haystack and straw piles.   It was the wind that I
couldn't stand.   The wind was a straight wind.   It came
in gusts.   It seemed to raise and lower without any time
much between, you know.   The wind came from the north
during the whole day.   There was times through the day
that I didn't think it was as bad as it was earlier.  .  .  .
The wind at that time was not near so bad as when I
was first out in the morning.   We had a little difficulty
to get along.   We had to keep hold of one another to make
it, and follow the fence until we got to the river.  .  .  .
I have lived in the immediate vicinity where I was then
living for forty or fifty years, and have been witness to
windstorms that we term in this country blizzards during
that time, all we have had since I have lived there.   I
remember other windstorms, but nothing nearly as bad.
High winds accompanied by blowing drifted snow are
quite frequent in that community.   I remember the bad
storms of the last thirty-five or forty years—the storms
that were noted and celebrated.   I remember some that
were pretty bad, but I never knew of anything to compare
with this one last winter; it was much worse.   I have no
means of determining the velocity of the wind except it
blew down the steel windmill.  .  .  .  I went out about
8 o'clock.   I was not blown away.   There was trouble
walking, and the wind was blowing me.   It was blowing

on my face. I had to turn around and stop to get my breath. I stayed out at the yard about fifteen minutes, and then I came back to the house. There was trouble in walking. I could not tell that the cattle were picked up and blown away. I am satisfied that the wind took them. . . . We tried to walk against the wind. We would have to turn around partly to get our breath. It was not so very cold. It was plenty cold, but I couldn't tell whether it was below zero. I didn't have a thermometer. I could stand the cold all right, the wind was what bothered me.

Another witness testified in speaking of windmills which were destroyed by the storm, as follows:

When I left the mill was in good condition. It was securely bolted. All the bands and the rods were in place. Everything was securely put together by me. I saw the tower after this storm. The tower was bent in the middle and fell to the ground and broke the wheel, so that it was not of any use. The angle steel bent and broke over. I think one of the angles was bent near a joint and the other two were bent between the bands. The steel was not broken, but it was bent. One of the bends, I think, was about four feet from the ground, one of them ten feet, and I think the other was about twelve or fourteen feet. The windmill lay in a twisted form, almost straight to the south. All the rods and the bands were bent and twisted. The platform was broken and the wheel was broken. The vane was bent and twisted out of shape. The pump rod, which was of oak, about an inch and a quarter square, was also broken. I heard of a number of windmills being broken by this storm. The first one that I remember was at Mr. J. J. Hall's; that was a Starr windmill, a wood wheel and a wood tower. It was eight or nine years old, but it was in good condition. The first twenty feet of the tower was constructed of four by six pine timber. The next twenty feet was constructed of four by four. They were bolted together, and spliced, bolted with half-inch bolts; the timbers were square. They were braced by two by six's at the bottom and one by six's from there up. It was braced also by wooden bands, I don't remember how far apart they were, about nine feet

at the bottom and they range different .distances from that up. It was braced as mills of its character—wooden mills—are usually braced. The wheel was a wooden wheel. The wheel was so arranged so that it would stand edgewise to the wind when not in motion. I saw this wheel before the storm; I saw it after the storm. It was blown down after the storm and broken to pieces. Some of the posts were broken at the anchor posts where they were bolted on, and some were broken eight or twelve feet high. The timbers were somewhat decayed in places. The decay was slight. The other timbers were new that I had put in a year or two before. This mill is a half a mile east and a half a mile south from Mr. Jordan's. . . . I remember a mill that belonged to Mr. Wheeler. It was about three miles east of Jordan's. It was a United States wood wheel mill. It was about seven or eight years old. The tower was fifty feet high and made of good, substantial timbers four by six at the bottom and four by four at the top. It was well braced and banded and in good condition. It was destroyed by the storm. It was broken. Some of the corner posts were broken at the anchor posts and some higher; I did not particularly notice. They seemed to be good timbers. I do not remember any other particular mills that were blown down. I remember a mill belonging to Mr. Liddy—Martin Liddy. He lived about two miles and a half from Jordan's. His mill was the same kind of a mill as Mr. Jordan's. It was damaged. The wheel and the vane were damaged. The mill was not blown down.

And another gave the following with reference to the storm:

All I could see was once in awhile where the cattle went and I followed their tracks. I couldn't see more than six feet. The air was filled with drifting fine snow, that thickened. It was so thick I could not see, and the wind was too fierce to turn around. I couldn't turn around and stand straight and look north or northeast or northwest. I couldn't do that, because the wind was so fierce. The only way I could possibly walk toward the wind was either to back up or walk sideways. Every little while I sat down on my haunches and held my hands this way

to get my breath to recruit up a little. Finally, I was in a certain pasture. I did not know just where, but I knew I was in a certain pasture. Whilst I was sitting down with my eyes to the south during a little gust, I thought I saw a dark spot. I went that way. It didn't take me long to go with the wind, and I found my cattle right there in a bunch not over twenty feet square, huddled right up against a wire fence all facing, every one facing south and all huddled together. I made all the effort in the world to drive them back. I drove them some fifty or sixty rods following the line fence between myself and my brother's due west. I could hold them there, understand, but they backed up and walked sideways, and I think it must have taken me half an hour to get them that distance. I drove my cattle by inches, backed them up. I couldn't do nothing with them, only get in front of them and hit them, either with the club I had or with the pinchers. I got them by inches. They kept backing away from me with the storm, but I kept hitting them and kept them up to the fence. . . . I couldn't find my cattle. I sat down, and while I was sitting there I says to myself, 'Now, Mister, look out for No. 1.' I got up and made a bee line for a fence that I supposed would lead straight to my house. In place of striking the fence, as I supposed, I struck a fence that went in the opposite direction, but I clung to the wire fence. I have been in storms before, and all that saved me was my experience and by clinging to the wire fence. I followed and kept going along. I didn't know one post of the fence, and I know them just as well as you know your A, B, C's, but the night before it had rained and froze, and everything was encrusted with ice, and everything was the same color. I got to a gate, a wire gate which was open. I was just sure in my mind that that was the gate I was looking for within a few rods of my yard. In place of that I was a hundred rods away by another field. I sat down every little while behind a fence post protecting myself from the fierce wind. I got up and went on one side of the fence first, and then on the other in order to make headway. I went along and finally struck a public highway. The only way I knew it was a public highway was because we have got a phone line on the north side of the farm and also one on

the east side of the farm at right angles. I knew I was near the public highway, but what public highway, whether the road running north and south or east and west, I didn't know. Finally I found myself going uphill. I knew that I ought not be going uphill to go to my house. I turned around and went the other way. I would sit down awhile behind the phone poles and rest; I was about all in. While I was resting behind a pole, I happened to know a fence where the wind had shook the ice off and detected some boards that were painted red. Then I knew that the house was in two rods of it, but couldn't see the grove or the house. That was the first time I recognized where I was in three hours. When I come in I couldn't speak or I couldn't stand up. I have been in lots of what we call 'old Iowa blizzards,' lots of them since I have been living here, but I never experienced any difficulty in breathing save by an illustration: Some fourteen to sixteen years ago there was a cyclone in this country that passed four or five miles north of us. Well, on that night we woke and our beds shook, and I went out of doors. There was not much wind at that time when I went out, but I thought there was something queer, I never experienced it before about my breathing. That is something like the difficulty I had in breathing this time. . . . I had lived in the county, as I said, since 1877. We often have blizzards in the winter, not so very often, but sometimes. I mean by a blizzard an ordinary gale of wind blowing in the winter when it is ten or twelve below zero, and blowing hard so that it is hard to be out in, but I have been out in any of the blizzards, and I would not think nothing of going a half a mile against a blizzard; I wouldn't think nothing of that. Compared with these blizzards I would say that it was much worse. I never experienced a wind since I am living here to blow as hard or anywhere near as hard as it did the day of the 29th of January last.

There was much other testimony to the same effect and the trial court was entirely justified in finding that there was such a windstorm as came within the terms of the policy. *Western Co. v. Smith,* 85 Fed. 405 (29 C. C. A. 223, 40 L. R. A. 653).

II. Appellant says, however, that the policy if so construed does not cover any loss or damage save that due directly to a windstorm such as a direct physical injury to the stock as by throwing them to the ground, driving them against some obstacle or the hurling of some object against them. As we view it, this is entirely too narrow a construction. It ignores a fundamental tenet for the construction of insurance policies to the effect that if a policy is so drawn as to require interpretation and be fairly susceptible of two different constructions, that one will be adopted which is most favorable to the insured. *Thompson v. Insurance Co.,* 136 U. S. 287 (10 Sup. Ct. 1019, 34 L. Ed. 408); *Holmes v. Insurance Co.,* 98 Fed. 240 (39 C. C. A. 45, 47 L. R. A. 308); *Meyer v. Insurance Co.,* 96 Iowa, 378; *Goodwin v. Insurance Co.,* 97 Iowa, 226; *Vorse v. Insurance Co.,* 119 Iowa, 555; *Krell v. Insurance Co.,* 127 Iowa, 748.

2. SAME: construction of policy.

III. Again, it is contended that the storm was not the proximate cause of the loss or damage; that the injury to the cattle was due directly, if not solely, to the conditions of the temperature. This was a question of fact to be determined from the testimony, and without setting it out it is sufficient to say that the trial court was justified in finding that the loss would not have happened but for the windstorm, and that this windstorm was the efficient cause of the damage. That other irresponsible causes may also have contributed to the loss does not, of itself, relieve defendant from responsibility. *Gardner v. Insurance Co.,* 110 Minn. 291 (125 N. W. 264, 26 L. R. A. (N. S.) 1004); *Russell v. Insurance Co.,* 100 Minn. 528 (111 N. W. 400, 10 L. R. A. (N. S.) 326); *Miller v. Insurance Co.,* 34 Iowa, 222; *Queen Ins. Co. v. Hudnut,* 8 Ind. App., 22 (35 N. E. 397); *Casualty Co. v. Lloyd,* 165 Ind. 52 (73 N. E. 824).

3. SAME: cause of loss.

The burden under the issues joined was upon defend-

ant to show that the loss or damage was due to snow or hail, or if we treat the amendment to the by-laws as bind-

4. SAME: exceptions: burden of proof.

ing and applicable to the case, to the blowing of snow or hail.   *Jones v. Association,* 92 Iowa, 652; *Payne v. Association,* 119 Iowa, 342.   This it failed to do, and as the trial court was justified in finding that the storm was an efficient and proximate cause of the damage there is nothing in defendant's present contention.

IV.   It is not necessary, perhaps, to decide the question of the validity of the amendment to the by-laws but the point, as it seems to us, has already been ruled by

5. SAME: amendment of by-laws: change of contract.

previous decisions of this court.   Plaintiff's agreement was to be governed by the articles of incorporation and rules in force when the policies were issued, or which might thereafter be made by the association.   The amendment passed by the association was not of its article or rules, but of its by-laws, and this amendment had the effect of introducing new terms and conditions into the original contract.   The rule referred to in this clause giving power of amendment had reference undoubtedly to these matters relating to the internal government of the society, and not to matters of contract between the association and its members.   Under the clause relied upon, defendant had no power to change any contract rights without the assent of the members or policy holders.   This question has recently been considered by us, and ruled adversely to appellant's contention in *Fort v. Iowa Legion of Honor,* 146 Iowa, 183.   See, also, *Farmers' Ass'n v. Slattery,* 115 Iowa, 410; *Ross v. Brotherhood,* 120 Iowa, 692; *Sieverts v. Association,* 95 Iowa, 710; *Field v. Association,* 117 Iowa, 185; *Matthes v. Association,* 110 Iowa, 222.

With these amended by-laws out of the case, the questions presented are not difficult of solution.   Taking the findings of fact of the trial court to be correct, as we must

under the record before us, its conclusions of law on these facts were correct, and a judgment for plaintiff followed as a logical sequence.

No error appears, and the judgment must be, and it is, *affirmed.*