CHICAGO AND EASTERN ILLINOIS RAILWAY CO. *v.*
WHIPKING.

[No. 13,754. Filed March 14, 1930. Rehearing denied December
30, 1930. Transfer denied February 24, 1933.]

*T. Morton McDonald, Douglas·H. McDonald* and *K. L. Richmond,* for appellant.

*Robert W. Armstrong,* for appellee.

MCMAHAN, J.—Complaint by Rose Whipking, benefiiary named in an accident insurance policy issued by appellant to Wash Whipking, one of its employees. A trial by jury resulted in a verdict and judgment for the plaintiff. The error assigned is the overruling of appellant's motion for a new trial. The contentions that the verdict is not sustained by sufficient evidence and that it is contrary to law will be considered together.

The policy covered "loss resulting directly and independently of all other causes, from bodily injuries and death effected solely through external, violent accidental means" sustained by the insured while actually engaged in the service of appellant and on duty.

It is appellant's contention that the evidence is not sufficient to show either that the insured's death was due to bodily injuries or that it was due to natural causes. More explicitly stated, appellant insists the uncontradicted evidence shows that the death of the insured was caused by cerebral hemorrhage and not by accidental injuries.

The insured at the time of his injury and death was employed by appellant as a boiler washer and it was his duty to wash the boiler of a certain engine. He went on duty about an hour before midnight. Shortly after midnight he was seen in a kneeling position on the ground at the step leading up to the deck of the engine. He was kneeling on one knee with the other knee bent, his head bowed, and one arm through the step-hanger of the engine step. On being called by another employee, he made no response. His fellow workers then went to him and discovered that he was unconscious and frothing at the mouth. It could be inferred that he had been on the engine, although no one saw him there. The hose, which he would have used for the purpose of washing the boiler, was at the point where he was found. One witness said it was lying across his knee as if he had been in the act of fastening the nozzle on the end of it, while other witnesses said the hose and nozzle were on the deck of the engine. The hose was two and a half or three inches in diameter and attached to a water plug at the side of the building. The nozzle weighed twenty to twenty-five pounds.

Bailey Watkins, a witness for plaintiff, testified that the usual work of the insured as a boiler washer was to take out the plugs, wash out the boiler and replace the plugs. In doing that he used the hose and nozzle, and wrenches. For some of that work he had to go up on the deck of the engine about five feet from the ground. He had seen the water turned on in the hose. The insured would be up on the engine holding the nozzle; he had to hold it. Sometimes somebody else would turn on the water for him, otherwise he had to turn it on himself. There was no helper with him. When the water was turned on in the hose it straightened out some. One has to stay there with it or shut it off when ready to leave. It heaves and pulls one until it gets steadied. On this particular night after he came to work he was at the cab as if he was fixing

to mount the hose. Did not see him have hold of the hose at that particular time. Did not see the hose there then, but did after he was hurt. The hose was across his right arm and the nozzle in the pit of his stomach. He was in a stooping position. He appeared to be unconscious. Spoke to him but he did not answer. Moved him to a work-bench and laid him down. He did not speak. Saw blood running out of his mouth. Don't know what was done with him. They took him away. He had hold of the nozzle when witness saw him in this stooping position. When the water is turned on, the hose will move one way or the other. It just moves around when the pressure is on. Didn't see any water flowing around there. No water coming out of the hose when witness saw it. It wasn't flopping around when he saw him there with the hose laying across his arm. He wasn't holding it then. He was kneeling over apparently unconscious. Saw him something like fifteen minutes before that time. He probably remained in that position fifteen or twenty minutes. Didn't see any broken arm. Helped carry him. Didn't see any bruise on his forehead. Couldn't tell what he had then. If he was injured in any way by being struck didn't know it. Didn't see any indication of it. This hose is the shut-off kind. It is turned on at the plug, but the nozzle has a shut-off. There is a cut-off valve on the nozzle and if the operator wants the water to run he opens it up. There is a lever on it. If he wants the water to stop the lever is used, but it is still in the line and the water remains connected to the nozzle. When the water is connected that makes the hose move. It will straighten out and fill. That is what makes the nozzle move, because it is standing full, and when one turns it on it will kick or jump. When you open it up, the water comes out. There was no water coming out of the nozzle and it wasn't opened up when witness saw it.

Following the death of the insured his body was taken

to the morgue where Dr. McCool performed an autopsy and made a report to the coroner, Dr. French, who testified that he examined the body; that the deceased had been bleeding at the mouth and nose and had a contusion on his forehead and also on his abdomen; that he had a fracture of the right arm between the elbow and wrist; that the cause of death was cerebral hemorrhage; several things may have caused the hemorrhage. It is a hard proposition on which to have an opinion, taking into consideration the broken arm, the contusion on the head and abdomen. No one can state definitely whether it was caused by a fall or not; from the fact that the deceased was injured he considered the hemorrhage was due to a fall. If he were standing and had a hemorrhage he might fall, but would not fall instantly; would go down gradually; might fall hard enough to break his arm. If he fell from an engine to the ground, a distance of five or six feet, the chances are he would inflict all the injuries. If he fell after being stricken with the hemorrhage he could inflict the injuries. The cause of death was cerebral hemorrhage.

Other witnesses testified that they saw and examined the body of the insured; that there was a contusion on his forehead, abdomen, and that one arm was broken. Several witnesses who were present immediately after the death and who helped remove the body said the arm was not broken.

Israel Miller, a witness for appellant, testified in part as follows: Was a locomotive inspector employed by appellant; went to work at 11:00 o'clock P. M. in roundhouse; saw Whipking at different parts of roundhouse; when he first saw him he blew the steam off; witness went outside to do some work and returned in about an hour; when he returned he passed the engine and saw Whipking on his knees; he talked with him before witness went out; at that time Whipking was standing close to the engine

ready to go to work; did not see hose at that time; saw hose after witness came from outside; the hose was then up in engine, in the deck; could not see where the nozzle was. After telling about his return and finding Whipking and the position he was in, said he got a bucket of water and washed his head and wrists; that at that time he had no bruises on his head; rubbed both of his arms; his arm was not broken that he knew of.

Sam Hines, a boiler maker employed at the roundhouse at the time of the insured's death, said part of the hose and the nozzle were up in the deck of the engine; that there was no water pressure on the hose; that deceased had started to pull the hose up; that he had not pulled the plugs on the engine; that plugs had to be pulled before the water was turned on; that the pressure of the water in the hose is not sufficient to jerk a man around or to make it difficult for a man to hold the nozzle; generally they pull the plugs and stick the nozzle in the boiler; the weight of the hose will hold it in position; the hose was twenty feet or longer; the water was not turned on; the hose did not have an automatic cut-off on it; it did not have a lever that the operator pulls open; did not go to see if the water had been turned on at the connection; the boiler washer turns on the water at the hydrant; he goes back and cuts the water off and changes from one hole to another; the hose and nozzle were lying on the deck of the engine, which is about four feet from the ground; they generally pitch it up there and then go up and pull it up; it had to be put there by somebody and Whipking was there; did not see anybody else there.

This is a sufficient review of the evidence to show its contradictory character as to the nature and extent of the injuries received by the insured, as well as to the position of the water-hose and nozzle. The witnesses all agree that the insured was found in an unconscious condition and that he died soon thereafter without regaining conscious-

ness. The medical testimony was that the direct cause of the death was cerebral hemorrhage, and while Dr. French said it was a difficult matter on which to have an opinion, he said that in his opinion the hemorrhage was caused by a fall. It is appellant's contention that instead of a fall causing the hemorrhage, the hemorrhage caused the fall, —that death was caused by the hemorrhage. In other words, that the death was the result of a disease and was not covered by the provisions of the policy. It seems to us that it was for the jury to determine whether the hemorrhage was the direct result of a fall, and that the jury could have drawn that inference. We cannot say there is no evidence justifying such an inference.

The evidence is sufficient to justify a finding that the insured fell and that the hemorrhage of the brain resulted from that fall. The causes of death referred to in the policy here involved relate to proximate and not to remote causes. When more than one cause contributes to an injury, and if there is doubt, or if the facts are such that equally prudent persons would draw different conclusions therefrom, the question as to which of the contributing causes is the efficient, dominant, proximate cause, is a question for the jury. "And," as was said in *Continental Casualty Co.* v. *Lloyd* (1905), 165 Ind. 52, 61, 73 N. E. 824, 827, "it makes no difference whether it (the jury) found that the cause closest the death was hemorrhage of the brain, or an organized blood clot within the walls of the cerebral artery. It had the right to find that the accidental fall was the cause that put his life in jeopardy, because it incited the fatal energy of the tumor, which was dormant, and would have remained so for an indefinite period, and, perhaps, until death from some other cause would have supervened."

In the instant cause, it was proper for the jury to find that the insured fell from the engine and that such fall set in motion a force that worked upon the then existing

condition in a natural and usual sequence to effect the fatal result. See *Kokomo Life & Acc. Ins. Co.* v. *Wolford* (1929), 90 Ind. App. 395, 167 N. E. 156.

While it is a close question as to whether appellee was entitled to recover, we are constrained to hold that the evidence is sufficient to sustain the verdict, and that it is not contrary to law.

Appellant's next contention is that the court erred in giving appellee's requested instruction 4, which is in substance as follows: That it was not incumbent on appellee to prove by eye-witnesses the exact manner in which the insured came to his death; that such facts could be shown by circumstantial evidence; that it was the duty of the jury to consider the marks, bruises and injuries that existed on the body as shown by the evidence immediately after the accident, for the purpose of determining whether the death was accidental; that if the jury found that the insured, in performing his labor was required to use a hose and nozzle that had a pressure of water passing through the same of about 100 pounds to the square inch and that when the water was turned into the hose it would straighten out with great force and that by reason of such force the insured was thrown or fell from the engine, it was not necessary to prove by eyewitnesses that the insured was seen to fall, or that the hose probably threw or jerked him from his position, but that such facts could be proven by circumstantial evidence, and that if the jury found that the insured's death was caused by reason of bodily injuries which were effected solely through external, violent and accidental means while the insured was actually engaged in the service of appellant and while on duty, the plaintiff would be entitled to recover.

The first objection to this instruction is that it assumes there was an accident. While the court used the word "accident," we do not believe the jury was misled thereby.

Appellant calls attention to the well-settled rule that instructions must be relevant to the issues and pertinent to the evidence, and, if an instruction is given concerning facts not supported by any evidence, the giving of such instructions will be reversible error, unless it clearly appears that the complaining party was not harmed thereby, and insists that there is no evidence that the water had been turned on, or that any water was passing through the hose, or that there was a pressure of 100 pounds to the square inch on the hose. There is merit in this contention. There is no evidence that the water had been turned on or that there was any pressure of water on the hose, nor is there any evidence to justify an inference that the water had been turned on and that by reason of the hose straightening out and the force of the water, the insured was thrown or fell from the engine.

Appellee's counsel, in his brief and on oral argument, assumed there was evidence showing that when the water was turned into the hose the force of the water caused the hose to move about with great force and rapidity so that it was difficult for a person to hold the nozzle and that as a result thereof the insured was thrown from the engine and that this was the direct cause of his death.

The fair inference is that the same position was taken in the trial court, and the giving of this instruction would warrant the jury in inferring that the court thought there was evidence sufficient to warrant a finding in favor of appellee upon the theory of this instruction. This is not a case where we can say the cause has been fairly tried, or that a correct result has been reached. The giving of this instruction cannot be held a harmless error.

Judgment reversed with direction to sustain appellant's motion for a new trial and for further proceedings.