GEORGE A. HOAGLAND & COMPANY, APPELLEE, v. INSURANCE COMPANY OF NORTH AMERICA, APPELLANT.

FILED MAY 26, 1936. No. 29676.

*Ziegler, Dunn & Becker,* for appellant.

*Johnsen, Gross & Crawford, contra.*

Heard before GOSS, C. J., ROSE, GOOD, DAY, PAINE and CARTER, JJ., and YEAGER, District Judge.

GOOD, J.

Plaintiff brought this action against defendant on an insurance policy to recover for loss and damage by windstorm to a lumbershed and lumber stored therein. Plaintiff had judgment, and defendant has appealed.

It is conceded that the policy was issued by defendant, was in force, and covered the shed and lumber stored therein. Defendant denied that any loss or damage occurred by reason of windstorm. It is defendant's contention that the building was old, decayed, and collapsed by reason of age and decay, and not because of any windstorm. One element of recovery was for assorting, repiling and reconditioning the lumber that was stored in the shed. Defendant contends that this was not an item for which plaintiff was entitled to recover, even if the loss and damage were occasioned by windstorm.

Plaintiff was the owner of a lumberyard and a number of sheds in which lumber was stored, located at or near Sixth and Douglas streets in the city of Omaha. The shed in controversy was about 289 feet in length and approximately 60 feet wide at one end and 70 feet at the other. The length of the building was from north to south. The shed was constructed by setting in the ground large poles which extended from 18 to 22, or 24, feet above the ground. There were six rows of these poles running lengthwise

of the building. The poles were set from 15 to 16 feet apart. They were braced and cross-braced with 2 by 6 or 2 by 8 planks. The poles in the central part of the building reached higher than those at the outer edge, so there was some slant to the roof which was erected over the building. The roof was what is ordinarily denominated a tar and gravel roof. The sides of the shed were not inclosed. The ends were inclosed except a small portion used as a driveway through the center of the building.

Between midnight and 1 o'clock a. m. on August 13, 1934, this particular lumbershed collapsed. The entire structure was shifted to the north, all of the poles being broken off, some at the ground and others several feet above the ground. The bracing was broken and destroyed, and some of the lumber within the shed was broken and damaged. Apparently, the entire building moved to the north. The shed was a total loss. The lumber that was broken and destroyed amounted to only about $178. The remaining lumber had to be assorted, removed and repiled in another shed. The item of cost for this was something over $1,000. The policy in suit was for $5,000. There was $9,000 other concurrent insurance. Plaintiff sought to recover only five-fourteenths of the loss.

The principal controversy is as to the sufficiency of the evidence to sustain plaintiff's claim that the building was destroyed by windstorm. Defendant's evidence tended to prove that many of the posts were decayed at the ground; some of them entirely decayed and others partially decayed; that the braces were old, the building was not sufficiently braced, and that the proximate cause of the collapse of the shed was due to its weak condition from age and decay. The evidence does not disclose the exact age of the building, but it is inferable that it had been constructed 25 or 30 years ago. Evidence on the part of plaintiff tended to show that the shed had been kept in repair and was in good condition.

With respect to the windstorm, it appears that on the

night of August 12, 1934, there was a thunder and rain-storm, accompanied by high winds, but that this storm had subsided prior to midnight. Defendant offered evidence by the meteorologist in charge of the government weather bureau station in Omaha that at that station the velocity of the wind between 12 and 1 o'clock that night did not exceed 15 miles an hour; that the velocity of the wind, during an earlier hour, had been higher. It was shown that the weather bureau station was about three-fourths of a mile distant from the lumbershed, was on much higher ground and was about 200 feet above the ground at that point. The meteorologist testified that there might be considerable variation in the velocity of the wind at the elevation of the station and at the lower or ground elevation, and that there might be a very great difference in the velocity at different points no farther apart than the distance between the weather bureau station and the lumbershed. Defendant also produced evidence that none of the other buildings in the immediate vicinity was blown down or apparently damaged by the alleged windstorm. Defendant called other witnesses who were at some distance from the shed, two of whom were toll takers on the bridge over the Missouri river, and who were on duty that night. They testified that they observed no unusual windstorm or high wind. Plaintiff offered the evidence of a night watchman, who was on duty that night and made his rounds of the various buildings of plaintiff once each hour. He testified that immediately before the building collapsed he was in it, when the wind was blowing violently; that the building creaked to such an extent that he was fearful for his life and ran out of the building to the south; that very shortly thereafter the building crashed and collapsed. He gave an opinion that the wind was blowing at 30 miles an hour. However, he had no basis for such estimate and testified that it was only his judgment. He also testified that the building was moved several inches on its foundation or at the ground, and that the entire shed moved to the north and collapsed; that the wind

was blowing from the south or slightly southwest. His description of the noise, the creaking and cracking of the building, just before he ran out, and the moving of a structure of such dimensions would tend to indicate a wind of considerable violence. There were other witnesses on behalf of plaintiff who were at a greater distance, but we do not think their evidence is of any great weight. None of plaintiff's witnesses had any means by which they could measure the velocity of the wind.

Defendant earnestly contends that the evidence is insufficient to sustain a finding that the collapse of the building was caused by a windstorm. It argues that, because no other building in the vicinity of the lumbershed was blown over, or, so far as appears, was damaged, is an indication that the collapse of this particular building was not caused by a windstorm.

What constitutes a windstorm, as that term is used in the policy of insurance has been considered by the courts of other states. Just what violence the wind must attain to be termed a windstorm has not, so far as we are aware, been judicially determined. The courts that have dealt with the question say that, where the word "windstorm" is used in connection with "tornado" and "cyclone," these other terms are of significance, and that, while a windstorm need not attain the proportions and violence of a tornado or cyclone, it must be a wind of unusual violence.

In 14 R. C. L. 1272, sec. 447, it is said: "In the case of a policy against damage by tornado, hurricane, or windstorm, the words 'tornado' and 'hurricane' are synonymous and mean a violent storm distinguished by the vehemence of the wind and its sudden changes. The word 'windstorm' partially takes its meaning from 'tornado' and 'hurricane,' and indicates wind of unusual violence." To the same effect is 5 Couch on Insurance, p. 4505, sec. 1234. See, also, *Mulgrew Co. v. National Union Fire Ins. Co.*, 187 Ia. 1292, 175 N. W. 50; *Sabatier Bros. v. Scottish Union & Nat. Ins. Co.*, 152 So. (La. App.) 85; *Scottish Union & Nat. Ins. Co. v. B. E. Linkenhelt & Co.*, 70 Ind. App. 324,

121 N. E. 373; *Jordan v. Iowa Mutual Tornado Ins. Co.*, 151 Ia. 73, 130 N. W. 177; Cooley's Briefs on Insurance, pp. 4976, 4977. In some of the cases it has been said that to constitute a windstorm the wind must assume the aspects of a storm; that is, an outburst of tumultuous force. Webster defines a windstorm as a storm characterized by high wind, with little or no precipitation.

It must be conceded that none of these definitions affords an exact yardstick by which to determine when a wind becomes a windstorm. It is apparent that only a very general definition of the term can be given. It must be a wind of unusual violence or tumultuous force, and whether it attains that proportion is a question of fact.

Defendant contends that, since it is not shown that any other buildings in the vicinity were blown down or damaged by the wind, it tends to negative the thought that it was a windstorm and that plaintiff's building was demolished thereby. We think it is a matter of common knowledge that in this part of the country a wind may attain the proportions of a windstorm and blow with great violence for a few seconds; may lift and only cover a small space. It is a matter of common knowledge that one of a group of farm buildings may be destroyed by a windstorm, while other buildings, in close proximity, are uninjured. Likewise, in orchards and groups of shade trees, one or more trees may be broken and damaged by the wind, showing great violence, while trees in close proximity thereto may be uninjured. The freakish character of the wind and the way it shifts and rises in this particular part of the country are matters of common knowledge. Where the evidence as to whether a windstorm is of sufficient violence or so tumultuous as to constitute a windstorm is in conflict, the question is one for the determination of the jury. 5 Couch on Insurance, p. 4505, sec. 1234.

We are of the opinion that the evidence of plaintiff's night watchman, who was on duty at the time the shed collapsed, was sufficient to indicate, and to authorize the

jury, if they believed his evidence, to find, that there was, at the time, a wind of unusual violence and tumultuous force, and that it amounted to a windstorm, within the meaning of that term as used in the policy of insurance. It is a rule that the appellate court will not disturb the verdict of a jury, based on conflicting evidence, unless the court can say that it is clearly wrong.

Defendant complains of instruction No. 7 given by the court to the jury. In the instructions immediately preceding the court had defined "windstorm" substantially in accordance with the authorities hereinbefore discussed, and informed the jury that before they could find for the plaintiff it was necessary to find that the wind had reached proportions of a windstorm, which was the dominant and efficient cause of the damage to the building, and in another instruction informed the jury that, if plaintiff was entitled to recover, the measure of recovery as to the building was the cash value of the shed at the time of loss, and that they should take into consideration, in determining such cash value, the depreciation from age, decay or other causes. The seventh instruction informed the jury that, if the shed was destroyed by reason of a windstorm, they should take into consideration its age only in determining the actual value and loss to the plaintiff. Taking the instructions as a whole, we find that they properly stated the law, and that no error was committed.

Defendant complains of the refusal of the court to give instruction No. 3 requested by defendant. We think the instruction was properly refused, because it directed the jury not to take into consideration whether or not the sheds had been weakened by wind or storm at any time previous to their destruction. We are pointed to no evidence that would justify the giving of this instruction.

Complaint is made of the refusal to give instruction No. 4 requested by defendant. The effect of that instruction was to inform the jury that the expense of assorting, removing and repiling the lumber in another shed was not a proper element of damage. It was necessary to

assort the lumber to ascertain and separate the damaged from the undamaged portions. It was also essential that the lumber not damaged should be removed and repiled in another shed to preserve it from damage from the elements. This was made necessary as a direct result of the windstorm, and we think it was a recoverable element of damage. The instruction was properly refused.

Complaint is made of the refusal to give instruction No. 5 requested by defendant, but the principles of that instruction are fully set forth in the instructions given by the court.

No error prejudicial to defendant has been pointed out, or found by the court.

AFFIRMED.