Adams Apple Products Corp. *v.* National Union Fire Insurance Company, Appellant.

Argued October 2, 1951. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS, ARNOLD and GUNTHER, JJ.

*Douglass D. Storey,* with him *Lemuel B. Schofield* and *Storey & Bailey,* for appellants.

*David V. Shapiro,* with him *Harry Shapiro* and *Shapiro, Rosenfield & Stalberg,* for appellee.

OPINION BY ROSS, J., January 17, 1952:

Adams Apple Products Corporation instituted separate actions of assumpsit against each of the four defendant insurance companies to recover for damage to its property alleged to have been caused by windstorm. By agreement of counsel the four actions were consolidated for trial, and after jury verdicts were rendered for the plaintiff against each defendant in the amount of its proportionate share of the loss with interest, and the defendants' motions for judgment n.o.v. and new trials were refused, these appeals were taken.

The plaintiff, engaged in the canning of apples, maintained its plant at Aspers in Adams County, Pennsylvania. The structures comprising the plaintiff's plant were located on land rising to the east away from the tracks of the Reading Railroad, which at this point run generally north and south. Near to, and parallel with, the railroad right of way were a canning factory, boiler room and warehouse. About half way up the slope was a frame "vinegar house". Near the top of the slope, about 100 feet from the railroad tracks, and extending along the slope parallel to them, were two rows of wooden bins used by the plaintiff to store apples. One row of these bins was about 200 feet long, and the other, a few feet farther up the slope, was about 100 feet long. The construction was of wooden slats of random width from 2 to 6 inches, spaced about 1 inch apart and resting upon heavy wooden posts or pilings sunk in the ground. There were 42 units in the two rows, each bin being about 15 feet square and between 6 and 7 feet high. The bins had been constructed in 1940, and, according to the testimony of a witness for the plaintiff, "were in very good condition".

Each of the defendants had issued to the plaintiff a policy of insurance indemnifying it against "direct

loss or damage by windstorm, cyclone, tornado and hail". At the trial the plaintiff sought to establish that 14 of its bins and their contents were damaged as the result of a "windstorm" which occurred sometime between noon on Saturday, October 26, 1946, and the following Monday morning.

Part of the plaintiff's evidence is unchallenged. When the last employe left its plant on Saturday, October 26, all of its storage bins were standing, filled with apples to about 80 per cent. of capacity. On Monday, October 28, 14 of the bins in the row nearest to the railroad tracks were down and parts and contents of them scattered down the slope for a distance of 70 feet. The posts or pilings upon which the demolished bins had rested were still standing, but leaned to the west.

No witness who saw the bins fall was produced by either side. The plaintiff called two witnesses whose testimony tended to establish that there had been a windstorm in the vicinity of its plant on Sunday, October 27. The first of these witnesses, Roy Adelsburger, a farmer who lived 3 or 4 miles from the plaintiff's plant, testified that on the day in question the wind "blowed a door off [his] barn", that it tore paper off the end of the barn and blew down one of several heavy boards leaning against his fence. Plaintiff's other windstorm witness, Charles W. Pitzer, testified that on October 27 he drove his four-door Packard sedan from his home in Gettysburg to a truck terminal located about a half mile from plaintiff's plant. He stated that it was a very "severe" night with the wind "rather stormy and raining and blowing" and it "really tossed your car around on the highway" and would "sort of bank into you". He testified further that on the night in question "it was very bad and badly blowing".

The defendants' case was an attempt to show that there had been no wind capable of damaging property during the weekend of October 26 to 28, and that the damage to plaintiff's bins was the result of structural defects combined with overloading. The defendants' expert, Leslie F. Conover, government meteorologist from the Weather Bureau station at Harrisburg, based his testimony on data collected at weather stations 30 to 35 miles from Aspers. Conover, however, stated that in his opinion "throughout the whole area the conditions were such that the air was stable and unlike air of a more turbulent or unstable characteristic and there could not have been present a wind storm in any classification you might consider".

To buttress the opinion of the meteorologist, the defendants presented evidence tending to show that there had been no windstorm damage to the buildings of the plaintiff's immediate neighbors, Gulden Lumber Company and Co-operative Fruit Growers. The lumber yard consisted of a planing mill, a boiler room with smokestack 80 feet high and two open sheds. Lumber of varying sizes was stored in the sheds in piles 6 to 8 feet high. The Co-operative Fruit Growers' installation consisted of a packing house building 50 feet wide, 200 feet long and one and one-half stories high. An open "crate platform" was located against the west face of the packing house. Apple crates weighing between 8 and 10 pounds each were stacked in piles 6 to 8 feet high on the platform on the date of the alleged windstorm. These apple crates, according to a defense witness, had not been disturbed by a wind.

Finally, a defense witness testified that he went to the scene of the alleged loss on November 2, 1946 and there examined the parts of the bins lying on the ground. He stated that the "timbers were badly weather beaten and showed evidence of rot or decay".

The defendants contend (1) that they were entitled to binding instructions because there was not sufficient evidence to permit the jury to find that the plaintiff's apple bins had been damaged by a windstorm; (2) that at least they were and are entitled to a new trial on the ground that the verdicts were against the fair weight of the evidence; and (3) that they were and are entitled to a new trial because the court below failed to define adequately the term "windstorm". We are agreed that the court below correctly disposed of the defendants' motions and the judgments will be affirmed.

We think that the principles which guided the Supreme Court in *Trexler Lumber Co. v. Allemannia Fire Insurance Co.,* 289 Pa. 13, 136 A. 856, rule this appeal with respect to the defendants' first two contentions. In the *Trexler* case the plaintiff brought an action of assumpsit on a policy of wind insurance. The policy in suit covered the plaintiff's lumber sheds in Allentown. These sheds fell and were destroyed while the policy was in force. The plaintiff did not produce any witness who had observed the fall of the sheds, but did produce a number of witnesses whose testimony tended to show that there had been a very strong wind "in Allentown" on the date the sheds fell. The evidence for the defense, including that of weather reports and weather observers, in the words of the Supreme Court, "tended strongly to disprove plaintiff's contention" that there was a windstorm. The defendant's expert, testifying from data observed by himself 60 miles away, and from reports of others, stated categorically that there was no windstorm in Allentown on the date in question. Finally, there was a contention on the part of the defendant, and evidence to support it, that the fall of the sheds was the result of the pressure of snow on the roofs thereof. The Supreme Court held that the ques-

tion of whether there had been a windstorm in Allentown on the day the plaintiff's sheds fell was a question for the jury.

The insured property in the present case was of relatively flimsy construction. It is not surprising that a wind strong enough to damage the plaintiff's bins was too weak to provide the plaintiff with dramatic evidence such as the toppling of an 80-foot smokestack imbedded in cement and supported by guy wires, or the deroofing of a building. With the exception of the Co-operative Fruit Growers' apple crates, the undamaged property of the plaintiff's industrial neighbors and of the plaintiff itself was of a much more substantial construction than the felled storage bins. As for the apple crates which were undisturbed, it is to be recalled that the platform upon which they were stacked was on the *west* side of a large building. The contents and parts of plaintiff's bins were scattered to the *west* of their original location, and the pilings upon which they had rested leaned to the *west*. It would seem logical to conclude that the wind which damaged the plaintiff's property moved from east to west.

As to the destruction of the plaintiff's bins being the result of structural deterioration, a clear question of fact was raised. Plaintiff's witness stated that the bins were in "very good condition"; while the defendants' witness testified that the "timbers were badly weather beaten and showed evidence of rot or decay". The credibility of these witnesses was for the jury, and that body resolved the issue in plaintiff's favor.

We think that the trial court properly submitted the cases to the jury and committed no error in leaving its verdicts undisturbed.

The defendants' final argument is concerned with the adequacy of the trial court's definition of the term

"windstorm" in its charge to the jury. They contend that the trial court should have instructed the jury that a "windstorm" requires wind of "unusual violence", that it must be of "violent force, vehement action, turbulent commotions and disturbance".

In defining a windstorm to the jury, the trial court stated: ". . . a storm is a disturbance in the air and that a wind storm is a storm characterized by *high* winds, or *violent* winds"; "A wind storm is a storm characterized by violence in the air and characterized by high winds"; and, a windstorm is a "high wind that is *violent* and tumultuous". (Italics supplied.) Thus, the jury was told that a windstorm is characterized by *high, violent* and *tumultuous* winds. We think that in the charge the defendants received all to which they were entitled.

It seems to us that *any wind,* strong and sustained enough to damage the insured property, is a "windstorm" within the meaning of the term as used in the policies and within the contemplation of the parties. In a well reasoned case, *Gerhard v. Travelers Fire Insurance Co.,* 246 Wis. 625, 18 N. W. 2d 336, the Wisconsin court had this to say: "In the absence of definition or limitation in the policy, we think that a windstorm must be taken to be a wind of sufficient violence to be capable of damaging the insured property either by its own unaided action or by projecting some object against it. This is especially true where, as here, the more violent forms of windstorm [tornado and hurricane] are specifically named as something different from a mere windstorm." This language was quoted with approval in *Fidelity-Phenix Ins. Co. v. Board of Ed., of Town of Rosedale,* 201 Okla. 250, 204 P. 2d 982, in which case it was added: "Considering the purpose of the coverage and the field of the risk, it would seem that any wind that is of such extraordinary force and violence as to thereby injuriously disturb the ordinary

condition of the things insured is tumultuous in character, and is to be deemed a windstorm within the purview of the policy, in absence of a provision therein to the contrary."

Judgments affirmed.