HAROLD PEARSON

*vs.*

AROOSTOOK COUNTY PATRONS

MUTUAL FIRE INSURANCE CO.

Androscoggin.    Opinion, November 6, 1953.

*Frank W. Linnell,* for Plaintiff.

*Frank M. Coffin,*
*Linnell, Brown, Perkins,*
*Thompson & Hinckley,* for Defendant.

SITTING: MERRILL, C. J., THAXTER, FELLOWS, WILLIAMSON, TIRRELL, WEBBER, JJ.

WILLIAMSON, J.    This is an action against an insurance company to recover damages for the destruction of plaintiff's hen house under a fire insurance policy with extended coverage against "direct loss by windstorm." The action

lies in assumpsit upon an account annexed under R. S., Chap. 100, Sec. 40. The case is before us on exceptions by the plaintiff to the direction of a verdict for the defendant at the close of the evidence.

The insurance policy was originally written in the amount of $12,000 in September 1949, for the term of five years. In December 1949 the amount of the policy was increased $5,000 to cover the new hen house. The policy was in full force and effect at the time of plaintiff's loss, and the amount of the loss, namely, damage to the hen house of $5,000 and damage to machinery of $1,000, is not questioned by the defendant.

The only issue is whether the hen house was destroyed by a windstorm within the meaning of the policy. Under the familiar rule that the evidence must be taken in the light most favorable to the party, here the plaintiff, against whom a verdict is directed, a jury in our view would be warranted without going into detail in finding the following pertinent facts:

(1) The hen house, a three story wooden building one hundred thirty feet by forty feet attached at one end to the plaintiff's barn, collapsed shortly after one o'clock P. M. on March 5, 1952, from the force of the wind. We are not concerned, as in *Unobskey* v. *Continental Insurance Co.*, 147 Me. 249, 86 A. (2nd) 160, with whether the loss was caused by a windstorm or surface water or some other cause. We have here a single known cause in the sense that a jury could so find, namely, the wind. To paraphrase the words of the policy, there was "direct loss by wind." The question is whether the *wind* which caused the loss was a *windstorm* within the meaning of the policy.

(2) One wall of the building was pushed an estimated seven feet from the foundation. Pieces of a wall or "siding" were blown "clear over the fence in Goss's field" a distance of seventy-five feet.

(3)   The plaintiff and his wife who were in their farm-house described the weather conditions in part in these words:

Mr. Pearson:

"Q.   Addressing yourself to - - Do you remember what kind of a day it was?

A.   It was stormy; the wind blowed.
   **THE COURT:   What the conditions were right there at the farm.
   THE WITNESS:

A.   Windy.

Q.**Some time after that, what happened?

A.   Shortly after that, there was a gust of wind that really - - Well, it shook the house, and, why, instants after that, or seconds, we thought the furnace had blowed up or - - what a crash we heard. I run right out in the kitchen and I met Mrs. Pearson - -.
   **********

A.   Well, it was an awful gust of wind.

Q.   How do you know it was a gust of wind?

A.   Of course, I can't prove it was wind. It was a kind of a - - I don't know - - pressure against the house; that is the first notice.
   *******

Q.   Prior to that time, had you been conscious of any particular amount of wind?

A.   Wind blowed hard all the forenoon, in gusts.

Q.   How could you tell?

A.   Well, you can hear it.
   *******

Q.   Could you see the snow blowing?

A.   Yes.

Q.   Could you hear the wind blowing?

A.   Yes.

Q. At the time the building went down, could you hear it then?

A. I guess you could hear it. Just before the building went down, you could hear it plenty; sounded like a gust come.

Q. Could you feel the house shake?

A. It jarred the house."

Mrs. Evelyn Pearson:
*******

"Q. Do you recall what the weather was on that day?

A. Yes. I was in the kitchen at the time and it was very windy and we heard this terrible, it seemed to be a gust of wind, and it - - I would say it shook the house, it was so bad."

Mr. Nay, who arrived soon after the collapse of the hen house, said:

"It was windy, was half rain, half sleet; driving conditions were very poor throughout the whole area."
*******
"It was windy, gusty, raining and snowing."

(4) There was much evidence of the manner in which the hen house was constructed. The plaintiff produced evidence to show that the hen house was in sound condition; and the defendant, evidence that the building could readily have collapsed from the force of a very light wind. There was no evidence of destruction of other property in the vicinity at the time the hen house collapsed.

We are not called upon to determine where the truth lies in the mass of contradictory but credible evidence. The fact-finder, that is the jury, must determine the force and violence of the wind insofar as it may be measured by the resistance offered by the hen house.

The defendant in its brief argues that the day was "nothing more than an ordinary March day in Maine, not a windstorm within the meaning of any decided cases or any standard dictionary definition."

*Unobskey* v. *Continental Insurance Co., supra,* is the only case in which our court has been called upon to determine the meaning of "windstorm" under an insurance policy. The court, hearing the case on report and so finding the facts, at page 252, said:

> "In the early morning hours of March 9, 1950, a heavy wind and rainstorm occurred. There was a high wind for several hours with a heavy downpour of rain."

and again, at page 256:

> "The wind was unusual, and at times of 'gale force.'"

Clearly there was a storm, and the only question on this phase of the case was whether it was a windstorm or some other type of storm. The decision was rendered for the defendant on the ground that although there was a windstorm, direct loss therefrom was not shown. It is apparent that we were not considering the minimum force or velocity of wind marking a windstorm. Much less severe conditions of weather fairly would have been called a windstorm. The decision does not help in solving the present problem.

We must turn elsewhere to reach the meaning of "windstorm" under the policy. From the dictionary we take the following definitions: "wind" — air in motion with any degree of velocity; "windstorm" — a storm characterized by high wind with little or no precipitation; "storm" — a disturbance of the atmosphere, attended by wind, rain, snow, hail, sleet, or thunder and lightning; hence, often, a heavy fall of rain, snow, or hail, whether accompanied with wind or not. *Webster's New International Dictionary,* Second Ed. (1946).

In holding a blizzard was a windstorm, the Iowa Court said in *Jordan* v. *Iowa Mut. Tornado Ins. Co.* (1911), 151 Iowa 73, 130 N. W. 177, 178, Ann. Cas. 1913 A 266, a case often cited: "(A windstorm) must assume the aspect of a storm, i.e., an outburst of tumultuous force."

In *George A. Hoagland & Co.* v. *Insurance Co.*, (1936), 131 Neb. 105, 267 N. W. 239, 241, the Nebraska Court said: "(A windstorm) must be a wind of unusual violence." See also 29 Am. Jur. 792, "Insurance," Sec. 1052; 45 C. J. S. 962, "Insurance," Sec. 888; Annot. in 126 A. L. R. 707, and 166 A. L. R. 380.

In *Gerhard* v. *Travelers Fire Ins. Co.*, (1945), 246 Wis. 625, 18 N. W. (2nd) 336, 337, we find the following definition:

> "In the absence of definition or limitation in the policy, we think that a windstorm must be taken to be a wind of sufficient violence to be capable of damaging the insured property either by its own unaided action or by projecting some object against it. This is especially true where as here the more violent forms of windstorm are specifically named as something different from a mere windstorm. . . If the defendant wishes to adopt some scale which establishes the velocity of wind necessary for a windstorm, or if it desires to limit its liability beyond the point that we have indicated, it should incorporate its proposed standard in the policy by clear terms and such ambiguities as are left in this policy should be resolved against it."

The Oklahoma Court in *Fidelity-Phenix Fire Ins. Co. of New York* v. *Board of Education of Town of Rosedale et al.* (1948), 201 Okla. 250, 204 P. (2nd) 982, 985, after quoting with approval the rule stated in the *Gerhard* case, *supra*, has added the following:

> "Considering the purpose of the coverage and the field of the risk, it would seem that any wind

that is of such extraordinary force and violence as to thereby injuriously disturb the ordinary condition of the things insured is tumultuous in character, and is to be deemed a windstorm within the purview of the policy, in absence of a provision therein to the contrary."

In *Druggist Mut. Ins. Co.* v. *Baker* (1952), 254 S. W. (2nd) 691, 692, the Kentucky Court said:

"It seems to us that in the absence of a definition or a limitation in the policy a windstorm must be taken to be a wind of sufficient violence to be capable of damaging the insured property, assuming the property to be in a reasonable state of repair. Applying that test to the evidence in this case, we are of the opinion that the evidence, although slight, was sufficient to take the case to the jury on the question of whether or not appellee's loss resulted from windstorm."

See also *Old Colony Ins. Co. et al.* v. *Reynolds et al.* (Ky. 1953), 256 S. W. (2nd) 362.

The cases cited *supra* sufficiently illustrate different approaches taken to the problem. To say that a windstorm must be "an outburst of tumultuous force" or "a wind of unusual violence," hardly more than states the difficulty. The vital questions are, accepting this definition of a windstorm, how much force or violence of wind does it take to make a windstorm, and how may it be measured.

In construing the meaning of windstorm, and the standard we are to use in determining the fact of storm or no storm, we must bear in mind the weather conditions existing in Maine against which protection is intended to be given. In the course of a year there will be windstorms in Maine within any common sense meaning of the term. If a year seems too short a period, we may take the term of the policy before us, namely, from December 1949 to September 1954. During this period the hen house of the plaintiff would be ex-

posed to a windstorm. In this respect windstorm insurance differs from fire insurance. There may never be exposure to fire during the term of the policy; there will necessarily by the nature of our climate be exposure to windstorm.

A second consideration we may fairly take into account is this: most buildings in Maine are not damaged by windstorm, and all windstorms do not cause damage. Surely the company would not have covered this hen house (and machinery therein) if hen houses of this type and size and in good repair would not withstand ordinary winds and indeed most windstorms.

We do not hold that any wind that damages insured property is a windstorm. Such a rule leaves out of consideration a highly important factor — namely the condition of the property. A *windstorm,* in our view, under the policy is a wind of force and velocity sufficient to cause damage to the property *if in reasonable condition.* The Kentucky Court has set forth in *Druggist Mut. Ins. Co.* v. *Baker, supra,* a rule which is reasonable, understandable, and workable.

On applying this rule to the permissible findings of fact, a jury could find a "direct loss by windstorm." The entry will be

*Exceptions sustained.*