162 So.2d 488

**GREAT AMERICAN INSURANCE COMPANY**

v.

**RAILROAD FURNITURE SALVAGE OF MOBILE, INC.**

**NIAGARA FIRE INSURANCE COMPANY**

v.

**RAILROAD FURNITURE SALVAGE OF MOBILE, INC.**

**FIREMAN'S FUND INSURANCE COMPANY**

v.

**RAILROAD FURNITURE SALVAGE OF MOBILE, INC.**

1 Div. 100–102.

Supreme Court of Alabama.

March 26, 1964.

Mead, Norman & Fitzpatrick, Birmingham, for appellants.

Caffey, Gallalee & Caffey, Mobile, for appellee.

HARWOOD, Justice.

In the proceedings below the plaintiff had filed three separate suits claiming damages under policies insuring against direct loss by windstorm. The policies issued by the several defendants were identical except as to amounts, and each contained a standard pro rata provision. The Great American Insurance Company was liable for 50% of any loss, and Niagara Fire Insurance Company and Fireman's Fund Insurance Company for 25% each.

The cases were by agreement consolidated for trial, the issues and evidence being the same in each suit.

After hearing before the court, without the intervention of a jury, the court entered a separate judgment for the plaintiff against each defendant, and assessed damages against Great American of $6,354.96, and against Niagara and Fireman's Fund of $3,177.48 respectively.

A motion for a new trial was filed in each case and denied. Hence this appeal.

The damages awarded in the three judgments total $12,709.92. For convenience we will hereinafter treat the totality of the judgments, rather than as separate amounts, since the records were consolidated for appeal, and the same principles control in each case.

The policies issued by the defendants contained coverage for perils of windstorm when "the building covered or containing the property covered shall first sustain an actual damage to roof or walls by the direct force of wind or hail * * *."

Sometime between 8:00 P.M., on 6 May 1960, and 7:45 A.M., on 7 May 1960, a portion of the roof of the building housing plaintiff's retail furniture business collapsed in the southeast corner. It had been raining and plaintiff's merchandise was damaged.

The plaintiff claimed the collapse was caused by windstorm. The defendants contended the evidence was insufficient to show that windstorm caused the collapse of the roof, but contended the roof collapsed because of rainwater impounded on the roof of the structurally weak building, and therefore was not within the coverage of the policies.

Assignments of error 1, 6, and 9, are grouped for argument and properly so, since all three assignments invoke the issue of whether the finding of the court that the loss sued for was caused by direct force of a windstorm, was palpably wrong and unjust, and contrary to the great weight and preponderance of the evidence.

The lower court, after hearing the witnesses, having found that the damage resulted from windstorm, such finding has the effect of a jury verdict and will not be disturbed unless palpably wrong. We are under the duty in this review to indulge all reasonable presumptions in favor of the trial court's findings, and cannot substitute our judgment for that of the trial judge on the effect of conflicting evidence. And if such finding is supported by the evidence, it is not subject to revision by us. Teague Hardware Co. v. Bankhead Development Co., 274 Ala. 697, 151 So.2d 611, and cases cited. And we must affirm the trial court's conclusions, if fairly supported by credible evidence under any reasonable aspect, regardless of what might be our view of the evidence. Lamar v. Lamar, 263 Ala. 391, 82 So.2d 558.

With these principles as a background, we set forth the following tendencies of the evidence presented by the plaintiff below, though admittedly, evidence was introduced by the defendant tending to contradict the plaintiff's evidence in its material aspects concerning the pivotal questions presented.

Alphonse Chaney was an employee of Harry's Restaurant on the night in question. This restaurant is in the same block as plaintiff's building and adjoins it.

Chaney testified that between 10:30 and 11:00 P.M., "a hard windstorm" came up. There was not too much rain, a little sprinkle, but mostly wind. This wind blew about five louvers back into the blades of the attic fan at Harry's Restaurant, and the witness had to go up on the roof and remove the louvers. The witness was glad to descend from the roof because the "wind was blowing pretty hard."

The witness further testified that he had worked at Harry's Restaurant some sixteen years, and during that time water had backed up into the restaurant whenever it rained hard, but no water backed up into the restaurant that night. When he descended from the roof the wind was blowing garbage cans up and down the street on which Harry's Restaurant and plaintiff's building are located.

Pete Russo, another employee of Harry's Restaurant for some ten or twelve years, testified that the night in question was rather stormy—"it was raining and the wind was blowing garbage and debris was going up and down the street. While flooding had been experienced at the restaurant, it depends on the amount of rain, and there was no flooding that night."

He was aware of the wind throughout the night until he left the restaurant between 2:00 and 3:00 A.M.

Upon leaving the restaurant he drove Chaney to his home. He noticed plenty of limbs in the street. The only physical damage to the restaurant that night was to the louvers of the ventilating fan.

On cross examination Russo testified that he would not call the rain that night as flooding—"it did not rain that hard." The limbs he observed in the street while driving Chaney home were in general as large as

his arm. No large trees in the vicinity of the restaurant were blown down.

J. F. Pate, a witness for the plaintiff, testified that he is a partner in the J. F. Pate Construction Company, and has been in the general constructing business since 1923. His company has built many of the main buildings in Mobile. During the thirty-nine years he has been in the constructing business he has been figuring the loads on roofs and structural strengths and his calculations have been checked out with the Southern Pine Manual. However, the building code of the city of Mobile governs what spans can be used.

He arrived at the plaintiff's building about 8 A.M., on the morning of 7 May 1960, in response to a telephone call.

The roof of the plaintiff's building had collapsed in the southeast portion, possibly a fourth of the roof. He observed water six to eight inches deep in the gutter, and some three or four inches deep inside the store. The building is actually in two parts, one a two story building facing Beauregard Street with the one story addition on the south side. Water from the roof of the two story portion of the building ran onto the roof of the one story building, and then would flow toward the southeast corner where there is a scupper or hole in the wall of the parapet at the top of the building, which allowed the water to flow into a metal down spout.

The roof had an extra good pitch for a flat roof and ran in all directions toward the southeast corner to the eight by twelve inch hole in the wall.

Mr. Pate gave detailed testimony as to the construction of the roof, the size of the beams, and rafters, and the manner in which the beams were nailed. The portion of the roof that had fallen in was nineteen feet square, and water from both roofs was going through the hole in the roof into the store below at the time of his arrival.

Mr. Pate testified that as it existed at the time of the collapse, the building had been erected in accordance with good building standards, and under the standards regarding the adequacy of relief systems, the relief system of this building was more than adequate. Mr. Pate figured that before the collapse the structure would support a superimposed load in excess of twenty pounds per square foot. A live load is a superimposed load over and above a dead load which results from the weight of the structure itself.

He examined the timbers and support members of the building and found them in good condition without any rot. In Mr. Pate's opinion the roof collapsed because of a superimposed load resulting from the wind.

On cross examination Mr. Pate testified that the Mobile Plumbing Code of 1959 sets forth the adequacy of a relief area based upon a four inch per hour rainfall, and the tendency of his testimony was that the plaintiff's building was well within the requirements of the building code. He further testified that he had seen this building since it was erected over thirty years ago and had seen rainfalls of five or six inches fall on the roof. The scupper hole in the wall was approximately level with the roof line and not more than an inch higher than the roof line, and therefore not over an inch of water would stand on the roof and that would be down in the southeast corner.

This witness did not see any of the rafters that were "end nailed," although there could have been one or two. Nailing rafters from the end is not as strong as lapping them, and lapping is the better practice.

The defendant's evidence was directed toward showing, first, that the roof collapsed because of the weight of ponding water on roof and, secondly, that the building was structurally unsound, and therefore not within the provisions of the policy.

In this connection the defendant introduced three expert witnesses, an architect, a structural engineer, and a consulting engineer.

They gave as their opinion that the collapse of the roof resulted from the weight of water impounded on the roof because of inadequacy of the size of the scupper to take care of the drainage directed to it.

Their opinions were arrived at after viewing the collapsed roof, its construction, etc., and applying thereto recognized engineering formulae. We will not attempt to set out the detailed and rather lengthy testimony of these witnesses. Suffice to say that an important factor in these calculations was the measurement of the scupper. One measured it at three inches by ten inches, another at four inches by eleven inches. The third did not testify as to the size of the scupper.

While two agreed on the overall size of the roof area, the third found it to be eight feet wider and eight feet larger than the other two.

■ Regardless, the testimony of these witnesses, not in accord in many material aspects with the testimony of plaintiff's witness, raised a question of fact within the province of the trier of fact to resolve.

In an effort to show the weather conditions on the night in question, the defendant introduced the meteorological records of Bates Field, and the weather station on the First National Bank Building. Bates Field is some eleven miles from the premises, and the First National Bank Building is some seven blocks.

These records indicate that 2.57 inches of rain fell at Bates Field during one of the one hour periods on the night in question, with the highest wind recorded being 46 miles per hour.

The rain gauge at the bank building showed that 4.30 inches of rain fell during the twenty-four hour period from 8:00 A.M., May 6, to 8:00 A.M., May 7, 1960. This gauge does not show any hourly rainfall but only the total for the twenty-four hour period.

For the defendant the meteorologist at Brookley Field, about half the distance from plaintiff's premises as is Bates Field, testified that the records at Brookley Field for the night in question showed a rainfall of .04 inches for the six hours preceding 11:50 P.M., on 6 May 1960, and a rainfall of 1.70 inches for the five hour period from 11:50 P.M., to 5:50 A.M., on 6–7 May. The wind gauge showed gusts of wind of a maximum of 31 miles per hour.

■ In North British & Mercantile Ins. Co. v. Sciandra, Ltd., 256 Ala. 409, 54 So.2d 764, 27 A.L.R.2d 1047, where the defense was, as in this case, that a roof collapsed from the weight of water upon it rather than from a windstorm, this court held that where the evidence tended to show that the velocity of the wind was as high as 31 miles per hour, it was for the trier of fact (jury) to determine whether such wind amounted to a windstorm. Clearly under all the evidence the existence of a windstorm in the present case was for the lower court and the evidence would justify the court's conclusion that there was a windstorm during the night in question.

Counsel for appellant however argue that a windstorm within the meaning of the policy of insurance is a wind of sufficient force and violence to damage property *in a reasonable state of repair*. In support of this contention counsel cite: Druggist Mutual Ins. Co. v. Baker, 254 S.W.2d 691 (Ct. of App.Ky., 1952); Pearson v. Aroostook County Patrons Mut. Fire Ins. Co., 149 Me. 313, 101 A.2d 183 (1953); Schaeffer v. Northern Assurance Co., Ltd., 177 S.W.2d 688 (S.Louis Ct.App., Mo., 1944).

■ Under the testimony of Pate it would appear that a question of fact as to the structural state of the building was presented, even though the testimony of these witnesses was discordant with the testimony of the defendant's witnesses in this aspect.

■ This aside, where there are no limiting terms, "windstorm" in a policy of insurance has been defined by other courts in general as being a wind of such tumultuous force and sufficient velocity as to proxi-

mately cause injury to the insured's property. Albert Lea Ice & Fuel Co. v. United States Fire Ins. Co., 239 Minn. 198, 58 N.W.2d 614; Adams Apple Products Corp. v. National Union Fire Ins. Co., 170 Pa. Super. 269, 85 A.2d 702; Fidelity-Phenix Fire Ins. Co. v. Board of Education of Town of Rosedale, 201 Okl. 250, 204 P.2d 982; Lunn v. Indiana Lumbermen's Mut. Ins. Co., 184 Tenn. 584, 201 S.W.2d 978, 171 A.L.R. 259; Fireman's Ins. Co. of Newark, N. J. v. Weatherman (Tex.Civ.App.), 193 S.W.2d 247; Roach-Strayhan-Holland Post No. 20, etc. v. Continental Ins. Co., 237 La. 973, 112 So.2d 680; Travelers Indem. Co. v. Wilkes County, 102 Ga.App. 362, 116 S.W.2d 314; Metropolitan Ice Cream Co. v. Union Mut. Fire Ins. Co., (Mo.App.) 210 S.W.2d 700; Gerhard v. Travelers Fire Ins. Co., 246 Wis. 625, 18 N.W.2d 336.

As stated by the Wisconsin court in the Gerhard case, supra:

"Any other view would work an imposition upon the insured. If defendant wishes to adopt some scale which establishes the velocity of wind necessary for a windstorm, or if it desires to limit its liability beyond the point that we have indicated, it should incorporate its proposed standard in the policy by clear terms and such ambiguities as are left in this policy should be resolved against it."

In rejecting the "reasonable state of repair" condition included in the definition of windstorm coverage, the Supreme Court of Mississippi, in New Hampshire Fire Inc. Co. v. Kochton Plywood & Veneer Co., 242 Miss. 169, 134 So.2d 735, pointed out that the insurer:

" * * * had the right to examine these buildings before they wrote the insurance and accepted the premium on the policies, and if they had examined the buildings and found they were not substantial they could have declined to write the insurance and have avoided the consequences of this loss."

We conclude that the concept of "windstorm" as expressed in the opinions of a majority of the courts of our sister states, which omit the element of the structural condition of the insured building, to be the sounder view, and adhere to it. In fact a reading of our North British & Mercantile Ins. Co., Ltd. v. Sciandra, supra, necessitates the conclusion that, by inference, this court has already adopted that view.

We conclude that assignments 1, 6, and 9, are without merit.

Assignments of error 1, 7, and 8, are argued jointly. Assignment 1 asserts the general ground that the court erred in overruling defendant's motion for a new trial.

Assignments 7 and 8, question the sufficiency of the evidence to support the amount of damages awarded.

Mr. Dyess, the owner of Railroad Salvage Furniture and Mr. Dulaney, the manager of the Mobile store, made an inventory of the goods damaged by the roof collapse.

This inventory was divided into three parts, and the records thereof were evidenced by Exhibits 8, 9, and 10.

Exhibits 8 and 9 related to merchandise totally damaged, and Exhibit 10 pertained to merchandise partially damaged. We will hereinafter refer to the merchandise represented by these exhibits as Lots 8, 9, and 10.

■ The award of damages cannot be made upon speculation, and the plaintiff has the burden of offering evidence tending to show to the required degree the amount of damages allegedly suffered. 7 Ala.Dig., Damages, ☞163(4).

As to the damages for which the defendant is liable, it must be noted that the policies provide that the defendant is liable:

"To the extent of the actual cash value of the property at the time of loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality within a reasonable time

after such loss, * * * and without compensation for loss resulting from interruption of business."

The above provision is certain and free from ambiguity, and must be enforced as written. Central Mutual Ins. Co. v. Royal, 269 Ala. 372, 113 So.2d 680, 72 A.L.R.2d 1283. It expressly limits the damages for which the defendant is liable to the actual cash value of the property at the time of loss, but not to exceed the cost of repair, or replacement with goods of like kind within a reasonable time after loss.

Mr. Dyess and Mr. Dulaney testified as to the retail value of the damaged merchandise. They also testified as to the invoice cost or wholesale cost of the merchandise, and Mr. Dyess stated the damaged merchandise could have been replaced at its cost price. Since this price is lower than the retail price, this is the value that must govern under the provisions of the policies.

Under the testimony of Dyess or Dulaney, or both in some instances, the wholesale or invoice cost of Lot 8 was $3,268.83, plus freight, and of Lot 9, $6,589.45, plus freight, or a total wholesale cost of $9,858.28 plus freight.

Dulaney fixed the freight costs at 10% of the wholesale costs. However, Mr. Dyess testified that the combined average freight costs of all of the furniture stores he owned (Biloxi, Mississippi; Pensacola, Florida; Selma, Alabama, and Mobile, Alabama) were 3%. When this testimony was called to his attention, Dulaney stated that Mr. Dyess handled the office records, and was in better position to know the freight costs than he, and that he would accept whatever Dyess said the freight costs were. Under this testimony, and the governing rules of evidence, we too must conclude that the freight costs should be found to be 3% of the wholesale costs of Lots 8 and 9, i. e., 3% of $9,858.28 or $295.75, making the total cost to plaintiff of Lots 8 and 9 to be $10,154.03. To this should be added $331.00, the cost of moving Lots 8 and 9 from the damaged store to plaintiff's warehouse. This would increase the $10,154.03 figure to $10,485.03. It was stipulated that the salvage value of Lots 8 and 9 was $2,335.78. Taking this amount from $10,485.03, leaves a balance of $8,149.25 as the proven damages insofar as Lots 8 and 9 are concerned.

As to Lot 10, the partially damaged furniture, both Dyess and Dulaney testified that the cost of this merchandise was $5,418.83 plus freight. Freight, at 3% of the cost would be $162.56, making the total cost or replacement value of $5,581.39.

This partially damaged furniture was sold by the plaintiff in regular course of business at a reduced price.

There is some confusion in Dyess' testimony, though at times he testified that Lot 10, was sold for 40% off of retail value. He also testified that the retail value of Lot 10 was 40% above the wholesale cost. This would fix the retail value of the furniture at $7,586.36.

Appellee determined the amount for which the furniture was sold by reducing the retail value by 40%. By this calculation the plaintiff realized $4,551.82 from the sale of the furniture covered in Lot 10.

However, as conceded, the plaintiff is entitled to the cost of selling this merchandise.

The evidence shows that the cost of selling goods in the appellant's Mobile store was 27¼% of its retail value.

Retail price, or value, is the price that the ultimate purchaser is expected to pay. See Guess et al. v. Montague, D.C., 51 F.Supp. 61.

The ultimate customers did pay $4,551.82 for the merchandise in Lot 10, and for the purposes of this case, that must be considered the price of the furniture, both in its reasonable market value, and its retail value. The cost of selling was therefore 27¼% of $4,551.82, or $1,240.37. Reducing the amount realized by the plaintiff

from the sale of Lot 10 ($4,551.82), by the cost of selling ($1,240.37), the plaintiff actually realized $3,311.45. His damages on Lot 10 would therefore be the difference between the cost to him ($5,581.39) and the amount realized from the sale ($3,311.-45) or $2,269.94.

Counsel for appellant contend that the 27¼% cost of selling cannot be applied since the plaintiff testified that the landlord had forgiven the rent during the time the roof was being repaired, and that rent must be considered a part of the cost of selling. The amount of rent not being shown, nor the length of time for which it was forgiven, counsel argues that the cost of selling is thereby rendered uncertain.

 It is not a defense to the merits in favor of one withholding money due that the plaintiff has received compensation from a third party, and this applies in contract as well as in tort. Gusikoff v. Republic Storage Co., Inc., 241 App.Div. 889, 272 N.Y.S. 77. Further, the principle requiring the injured party to minimize the damage has no application where the measure of damages is the market value of the property before and after damage. Birmingham Ry., Light & Power Co. v. Long, 5 Ala.App. 510, 59 So. 382. See also Bachelder v. Morgan, 179 Ala. 339, 60 So. 815, wherein it was held that donation by employer to injured employee whose injuries rendered him unfit for work could not be considered in minimizing plaintiff-employee's damages. "This donation was a matter with which defendant had no concern."

It therefore appears that under the proof, and viewing the evidence most favorable to the appellee, as we are obliged to do on this appeal, that the appellee has established damages totalling $10,419.19.

 Appellee was also entitled to interest from the date such amount of damages should have been paid, (Section 62, Title 9, Code of Alabama 1940), to date of trial. The judgment was rendered on 23 July 1962.

It appears from the record that notice of loss was stipulated. An insurance adjuster, representing the insurance company, was at the scene on the morning of 7 May 1960. From this it must be inferred that notice was given on 7 May 1960. The policy provided that loss covered by the policy should be payable 60 days after proof of loss. This would be 7 July 1960. Interest at 6% on the damages of $10,419.19 for two years and 16 days would also be due appellee. This would amount to $1,275.66.

The total amount of the damages ($10,-419.19) plus interest ($1,275.66) comes to $11,694.85, and this is the amount the lower court should have found due under the evidence.

The court assessed the amount due under the judgments as totalling $12,709.92. This amount was excessive by the amount of $1,015.07.

We therefore direct that the judgments be so modified, and apportioned as to award damages and interest in an amount in accord with this opinion. Section 810, Title 7, Code of Alabama 1940.

We pretermit consideration of assignments 4 and 5 as the principles already written to would also be applicable to these assignments.

As modified, the judgments are affirmed.

Affirmed.

LIVINGSTON, C. J., and SIMPSON and MERRILL, JJ., concur.