529 P.2d 711

### ST. PAUL FIRE AND MARINE INSURANCE COMPANY, a corporation, Appellant,

v.

### CENTRAL PARK MOBILE HOMES, a partnership, Appellee.

### No. I CA–CIV 2119.

Court of Appeals of Arizona,
Division 1,
Department B.

Dec. 17, 1974.

---

Himelstein & Timbanard, P. C. by Jeffrey R. Timbanard, Phoenix, for appellant.

Gerst & Campo by John Campo, III, Phoenix, for appellee.

## OPINION

EUBANK, Judge.

This appeal presents two questions concerning the extended coverage endorsement of a standard builder's risk insurance policy:

(1) What is a "windstorm" within the terms of the policy?

(2) What is the extent of the insurer's liability for "direct loss" or damage due to a windstorm?

The appellee, Central Park Mobile Homes, was the insured under a builder's risk policy of insurance issued by the appellant, St. Paul Fire & Marine Insurance Company, which covered a recreation building during the course of its construction. Under the provisions of the "Extended Coverage Endorsement", the policy included protection "against direct loss by windstorm".

On the morning of June 16, 1971, a work crew erected fifty prefabricated roof trusses with a forty-two foot span across the recreation building. Prior to leaving the construction site that afternoon, the workmen temporarily braced all fifty trusses by nailing a ten foot board every eight feet across the north side of the trusses. About one-half hour after their departure, the roof trusses collapsed, causing extensive damage to the building. The insured claimed that the collapse was due to a windstorm. The carrier, however, denied coverage, contending that there was no windstorm at the time of the damage and that the collapse of the trusses was due to improper construction. This suit for breach of contract followed.

During the trial, without a jury, the court heard extensive testimony regarding the force of the wind at the time and place in question. Meteorological records from Mummy Mountain Weather Observatory

(approximately nine miles east of the construction site) and Sky Harbor Airport (some 20 miles from the construction site) were placed in evidence, which disclosed that the wind velocity at those locations was 8 m. p. h., with gusts up to 12 m. p. h., at the time the trusses collapsed. The appellant presented testimony which indicated that the wind on June 16th was no different than that experienced throughout the month of June at the construction site. The appellee, on the other hand, introduced the testimony of several individuals who were at the site when the collapse occurred. One of these eye witnesses testified that "the winds were gusty" and that a strong gust of wind "blew the trusses over". Testimony was also heard regarding the bracing of the trusses prior to the collapse. The trial court granted judgment for the insured, ruling that the damage was caused by a windstorm and that the carrier was liable for the loss.

## I. WHAT CONSTITUTES A "WINDSTORM" WITHIN THE TERMS OF THE POLICY?

The question of what is a windstorm within the meaning of an insurance contract is one of first impression in our jurisdiction. The decisions rendered by the courts of other jurisdictions have not been consistent. See Annot., 93 A.L.R.2d 145 (1964). Appellant contends that a windstorm must be something of a violent and unusual nature amounting to an "outburst of tumultuous force". From this definition it is argued that the evidence presented to the trial court failed to establish that a windstorm occurred at the time and place in question. The definition urged by appellant was apparently first suggested in Jordan v. Iowa Mut. Tornado Ins. Co., 151 Iowa 73, 130 N.W. 177 (1911), wherein the court stated:

"The word 'windstorm' is a simple one and is defined by Webster to be: 'A storm characterized by high wind with little or no precipitation.' As used in the policies in suit it should be construed as

something more than an ordinary gust of wind, no matter how prolonged, and it takes its meaning measurably at least from the other words with which it is associated, to wit, tornado and cyclone. However, it need not have either the cyclonic or the twirling or whirling features which usually accompany tornadoes or cyclones, but it must be more than an ordinary current of air no matter how long continued. In other words it must assume the aspect of a storm, i. e., an outburst of tumultuous force." 151 Iowa at 77–78, 130 N.W. at 178.

The policies under consideration in Jordan provided protection against "tornado, cyclone or windstorm". The court reasoned that the term "windstorm" took its meaning to a measurable extent from the associated words "tornado" and "cyclone". See 11 G. Couch, Insurance § 42:335 (2d ed. 1963). Even after the language of most extended coverage endorsements was revised to eliminate the words "tornado", "cyclone" and "hurricane", many courts continued to define windstorm as an "outburst of tumultuous force". E. g., Metropolitan Ice Cream Co. v. Union Mut. Fire Ins. Co., 210 S.W.2d 700 (Mo.App.1948). An increasing number of courts, however, have not been satisfied with such a general definition. See Grissom, The Scope of Windstorm Coverage, 1960 Ins.L.J. 615, 621. In Pearson v. Aroostook County Patrons Mut. Fire Ins. Co., 149 Me. 313, 319, 101 A.2d 183, 186 (1953), the court concluded:

"To say that a windstorm must be 'an outburst of tumultuous force' or 'a wind of unusual violence', hardly more than states the difficulty. The vital questions are, accepting this definition of a windstorm, how much force or violence of wind does it take to make a windstorm, and how may it be measured."

In Gerhard v. Travelers Fire Ins. Co., 246 Wis. 625, 627–628, 18 N.W.2d 336, 337 (1945), an alternative test for the existence of a windstorm based on the resistance of-

fered by the insured property itself was first suggested:

> "In the absence of definition or limitation in the policy, we think that a windstorm must be taken to be a wind of sufficient violence to be capable of damaging the insured property either by its own unaided action or by projecting some object against it. This is especially true where as here the more violent forms of windstorm are specifically named as something different from a mere windstorm. Any other view would work an imposition upon the insured. If defendant wishes to adopt some scale which establishes the velocity of wind necessary for a windstorm, or if it desires to limit its liability beyond the point that we have indicated, it should incorporate its proposed standard in the policy by clear terms and such ambiguities as are left in this policy should be resolved against it."

A substantial number of jurisdictions adopted the Gerhard definition, finding it more reasonable than that suggested by the earlier cases. E. g., Albert Lea Ice & Fuel Co. v. United States Fire Ins. Co., 239 Minn. 198, 58 N.W.2d 614 (1953). In Adams Apple Products Corp. v. National Union Fire Ins. Co., 170 Pa.Super. 269, 85 A.2d 702 (1952), the court said:

> "It seems to us that *any wind*, strong and sustained enough to damage the insured property, is a 'windstorm' within the meaning of the term as used in the policies and within the contemplation of the parties." 170 Pa.Super. at 275, 85 A.2d at 705.

*See also* Napanoch Realty Corp. v. Public Service Mut. Ins. Co., 39 A.D.2d 438, 336 N.Y.S.2d 489 (1972). *But see* Crozier v. Lenox Mut. Ins. Assn., 252 Iowa 1176, 110 N.W.2d 403 (1961).

Almost from its inception, the definition of a windstorm in terms of its damaging force has received one principal refinement—that the condition of the insured property must be taken into consideration. In Pearson v. Aroostook County

Patrons Mut. Fire Ins. Co., supra, the court said:

> "We do not hold that any wind that damages insured property is a windstorm. Such a rule leaves out of consideration a highly important factor—namely the condition of the property. A *windstorm,* in our view, under the policy is a wind of force and velocity sufficient to cause damage to the property *if in reasonable condition.*" 149 Me. at 320, 101 A.2d at 186.

*Accord,* Druggist Mut. Ins. Co. v. Baker, 254 S.W.2d 691 (Ky.Ct.App.1952); *see* Fidelity-Phenix Fire Ins. Co. v. Board of Education, 201 Okla. 250, 204 P.2d 982 (1948). In our opinion, this line of cases provides a rule which is both reasonable and practicable. Its application here allows for recognition of the fact that a building under construction is not as structurally stable as when completed, and is, therefore, more vulnerable to damage from the force of the wind. While some courts have specifically rejected this consideration, e. g., Stephens v. New Hampshire Ins. Co., 92 Idaho 537, 447 P.2d 14 (1968), we are persuaded that due regard for the condition of the insured property is necessary in order to uphold the expectations of *both* parties to a contract of insurance. Accordingly, we hold that where the term "windstorm" is undefined in a policy of insurance, it means a wind of sufficient force to damage insured property, if in a reasonable condition, either by its own unaided action, or by projecting some object against it. Applying this standard to the case at hand, we are compelled to conclude that there is reasonable evidence in the record to support the trial court's finding that a windstorm occurred at the time and place in question.

II. WHAT IS THE EXTENT OF THE INSURER'S LIABILITY FOR "DIRECT LOSS" OR DAMAGE DUE TO A WINDSTORM?

Appellant contends that the trial court erred in refusing to follow the gen-

eral rule that the insurer's risk is direct loss from a windstorm and not from a building collapse resulting from improper construction. We interpret appellant's argument to be that the windstorm was not the proximate cause of appellee's loss, and agree with the contention that if the collapse of the trusses was due to improper construction, the loss was not the proximate result of a windstorm and no recovery may be had under the extended coverage clause.[1] *See* Grissom, The Scope of Windstorm Coverage, 1960 Ins.L.J. 615, 628.

In Old Colony Ins. Co. v. Reynolds, 256 S.W.2d 362 (Ky.Ct.App.1953), several "builder's risk" policies insuring a tobacco warehouse under construction against "direct loss by windstorm" were under consideration. Although the carriers had presented substantial evidence indicating that the warehouse collapsed as a result of faulty construction, the court said:

> "[W]e must bear in mind that these policies insured against risks during the course of construction, and during that time every part of the building would not necessarily be as structurally stable as the completed job. While appellants make a very strong argument that the collapse of the building was the result of faulty construction, we cannot determine such fact as a matter of law." 256 S.W.2d at 363.

In Napanoch Realty Corp. v. Public Service Mut. Ins. Co., 39 A.D.2d 438, 336 N.Y.S.2d 489 (1972), a fire insurance policy covering a casino during the course of its construction was under consideration.

In a situation not dissimilar to that in the instant case, forty-five trusses had been installed and braced when a collapse occurred. The court concluded that "whether or not the loss was caused by windstorm was, upon the evidence produced, a question of fact . . .." (39 A.D.2d at 439, 336 N.Y.S.2d at 490). *Accord, e. g.,* Bogalusa Gin & Warehouse, Inc. v. Western Assurance Co., 199 La. 715, 6 So.2d 740 (1942); Pearson v. Aroostook County Patrons Mut. Fire Ins. Co., supra.

The issue of proximate cause is one of fact. In the instant case, the appellee produced evidence that the construction and bracing of the roof trusses was accomplished in a normal, standard and workmanlike manner. Appellant, on the other hand, introduced evidence to the contrary. In this situation, it was for the trial judge as the trier of fact to determine whether the trusses collapsed as a result of a windstorm, or whether they failed because of a structural defect. Since no request was made for findings of fact, we must assume that the court found the issue in favor of the appellee. Silva v. DeMund, 81 Ariz. 47, 299 P.2d 638 (1956). The trial court's determination will not be disturbed if there is reasonable evidence to support its finding. Silva v. DeMund, supra. In our opinion, there is reasonable evidence in the record from which to conclude that the collapse of the trusses was due to a windstorm.

The judgment is affirmed.

JACOBSON, C. J., and HAIRE, P. J., concur.

---

1. In characterizing appellant's argument as raising the issue of causation, we are not required to decide whether the phrase "direct loss" is limited to immediate physical damage caused by the strength or force of wind, or whether it extends to any damage in a "chain of events" set in motion by a windstorm.

*Compare* Abady v. Hanover Fire Ins. Co., 266 F.2d 362 (4th Cir. 1959), *with* Lipshultz v. General Ins. Co., 256 Minn. 7, 96 N.W.2d 880 (1959). *See* Annot., 93 A.L.R.2d 145, 181 (1964). *See generally* 44 Am.Jur.2d Insurance § 1393 (1969).